50 F.3d 151
 98 Ed. Law Rep. 670
 Lucia GARDINER, Individually, and as the Natural Parent of
Her Infant Child, Jacqueline Gardiner, Plaintiff-Appellant,
v.
INCORPORATED VILLAGE OF ENDICOTT, N. P. DiNunzio, Detective
Individually and in his official capacity and G.
O'Neill, Lieutenant Individually and in his official capacity,
Defendants-Appellees.
 No. 197, Docket 93-9309.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 16, 1994.
Decided March 17, 1995.
 
 Ronald R. Benjamin, Binghamton, NY, for plaintiff-appellant.
 Timothy J. Perry, Sugarman, Wallace, Manheim & Schoenwald, Syracuse, NY, for defendants-appellees.
 Before: LUMBARD, OAKES and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiff-appellant Lucia Gardiner ("Gardiner"), suing individually and as the natural parent of her daughter Jacqueline Gardiner ("Jackie"), commenced this action against, among other persons, defendants-appellees Incorporated Village of Endicott, Detective Nicholas P. DiNunzio ("DiNunzio"), and Lieutenant Gary O'Neill ("O'Neill"), seeking damages for alleged constitutional violations pursuant to 42 U.S.C. Sec. 1983. In her complaint Gardiner alleged that her Fourth Amendment rights and those of her daughter were violated when Jackie was taken from her school to the Endicott police station and when both Gardiner and Jackie were detained at the police station and hospital, where Jackie was allegedly compelled to undergo a physical examination.
 
 
 2
 At the close of Gardiner's case, the district court granted defendants-appellees judgment as a matter of law. The district court held that Gardiner failed to produce any evidence that she was "seized" within the meaning of the Fourth Amendment. With respect to Jackie, the district court dismissed the action as against DiNunzio and O'Neill on the grounds of qualified immunity. On appeal, Gardiner contends that the district court erred on both grounds. Because we agree that judgment as a matter of law was appropriate, we affirm the judgment of the district court.
 
 BACKGROUND
 
 3
 In early October 1990, Jackie was a seventh-grade student at the Jennie F. Snapp Middle School in Endicott, New York. School officials became concerned about what they perceived as Jackie's problems, such as poor academic performance, difficulty interacting with her peers, and an apparent sexual identity crisis. These concerns were aggravated by the discovery of a disturbing note allegedly written by Jackie, in which she claimed that she was actually a boy trying to evade detection by her father who was attempting to kill her. Members of the school's student support team, comprised of the school's guidance counselors, home school coordinator, psychologist, assistant principal Jacqueline Casazza ("Casazza"), and principal, met with Gardiner to discuss her daughter's problems. Because the meeting was unproductive, Casazza contacted the New York State Department of Social Services ("DSS") and filed a "hotline report" with respect to Jackie. Concerned persons may file such reports when they believe a child is in danger or is being neglected.
 
 
 4
 On October 11, 1990, DiNunzio, the juvenile officer for the Village of Endicott, and O'Neill, then lieutenant of detectives, came to the school pursuant to a phone call based on the hotline report. Upon their arrival, the officers met Casazza, whom DiNunzio had known for several years in the course of his juvenile division work. Casazza asked why they were at the school, and they responded that DSS had requested that they take Jackie to the police station in connection with the hotline report. Because all present agreed that Jackie could not be taken from school without parental consent, Casazza went to her office to call Gardiner.
 
 
 5
 Casazza testified that she spoke to Gardiner and informed her that the officers were at school and that DSS wanted to speak to her and Jackie. According to Casazza, Gardiner said that Jackie could go to the police station with the officers. Gardiner also allegedly declined to have a police officer pick her up and transport her to the station. Casazza testified that she then told DiNunzio and O'Neill that Gardiner had consented to having Jackie taken to the police station. DiNunzio similarly testified that Casazza told him and O'Neill that Gardiner had given her permission to have Jackie taken from school, although DiNunzio did not actually hear the conversation between Casazza and Gardiner. Casazza also testified that Gardiner called roughly 15 minutes later to say that she could not go to the police station immediately because she had to wait for her younger children to return home. Casazza relayed this information to the police department. Gardiner, on the other hand, testified that she did not receive a phone call from Casazza at any time on October 11, and that the first call she received was from DiNunzio, who informed her that Jackie was at the police station. At a prior deposition, however, Gardiner stated that she was not sure to which officer she originally spoke.
 
 
 6
 Once Casazza told the officers that Gardiner had consented, O'Neill walked with Jackie to the rear of the school to get her bicycle, while DiNunzio brought the police car around. Jackie was neither restrained nor told she was under arrest, although she did testify that O'Neill had his arm on her at one point. DiNunzio's police report of the entire incident stated in relevant part that "we went to JF Snapp and picked up JACKIE GARDINER after school. Her mother LUCIA GARDINER was contacted and responded to PD."
 
 
 7
 When they arrived at the police station, Jackie was taken to the juvenile office where she was questioned for between thirty and forty-five minutes. DiNunzio testified that he questioned Jackie, during which time she allegedly admitted to writing the note and stated that her mother had beaten her on occasion. DiNunzio ultimately determined that there was nothing to support a criminal charge in the matter, and his contact with Jackie terminated when DSS workers arrived at the police station to interview Jackie. O'Neill corroborated DiNunzio's testimony. He further testified that he questioned Gardiner at the station regarding whether she beat Jackie, and that Gardiner provided him with Jackie's birth certificate. DiNunzio testified that he had no contact with Gardiner on October 11. Gardiner, on the other hand, testified that the only officer she spoke to at the station was DiNunzio, who asked her about child abuse and examined Jackie's birth certificate.
 
 
 8
 At some point, DSS workers intervened and took over the interview. They decided that Jackie should go to an area hospital for a physical examination to confirm her gender. O'Neill and DiNunzio did not participate in this decision, but rather deferred to the DSS based on their belief that there was no police matter to investigate. O'Neill asked a police detective to transport the Gardiners to the hospital, but neither he nor DiNunzio went to the hospital. Jackie confirmed that neither DiNunzio nor O'Neill asked her to go to the hospital and submit to a physical examination. Gardiner alleges that although she signed a form consenting to the examination of her daughter, she did so only upon undue pressure from the DSS workers.
 
 
 9
 Gardiner subsequently commenced this action. Her action against the school district and its employees and the DSS workers was settled prior to trial, while her claims against the examining physician and the Village of Endicott were dismissed by summary judgment, with no appeal taken therefrom. The matter proceeded to trial solely as against DiNunzio and O'Neill. At the close of Gardiner's case, the district court granted the defendants a directed verdict. Subsequently, the district court denied Gardiner's motion for a new trial because of the lack of evidence that Gardiner was seized within the meaning of the Fourth Amendment, and because of the officers' good faith belief that they had Gardiner's permission to remove Jackie from the school. Gardiner now appeals.
 
 DISCUSSION
 
 10
 A district court should grant a directed verdict when the evidence, viewed in a light most favorable to the nonmoving party, is such that a rational juror could reach but a single conclusion. See Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038-39 (2d Cir.1992). We apply this same standard on appeal. See Metromedia Co. v. Fugazy, 983 F.2d 350, 359 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). Accordingly, we will uphold the directed verdict if, "drawing all reasonable inferences and making all credibility assessments in favor of the nonmoving party, there was not sufficient evidence to permit a rational juror to find in that party's favor." See Jackson v. Domtar Indus., Inc., 35 F.3d 89, 92 (2d Cir.1994).
 
 1. "Seizure" of Gardiner
 
 11
 Gardiner's first argument on appeal is that the district court erred in concluding that she was not seized within the meaning of the Fourth Amendment by O'Neill and DiNunzio. She concedes that the police officers did not touch her, display their weapons, use language indicating a show of authority, or formally restrain her in any way, either prior to her arrival at the police station or at the station while her daughter was questioned. Instead, Gardiner claims that her presence at the station was involuntary because she did not feel free to leave while the officers were questioning her daughter. We reject her contention.
 
 
 12
 An individual is seized by the police only if, under the circumstances, " 'a reasonable person would have believed that he was not free to leave.' " Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). In other words, a seizure occurs only when a reasonable person would feel restrained by physical force or a show of authority. See Mendenhall, 446 U.S. at 553, 100 S.Ct. at 1877-78. Factors suggesting that a seizure has occurred include: the threatening presence of police officers; the display of a weapon; physical contact by the officer; language indicating that compliance with the officer is compulsory; prolonged retention of a person's belongings; and a request by an officer to accompany him or her to the police station or a police room. See United States v. Lee, 916 F.2d 814, 819 (2d Cir.1990). We determine de novo whether a seizure occurred. See United States v. Glover, 957 F.2d 1004, 1007 (2d Cir.1992).
 
 
 13
 Although Gardiner understandably chose to remain at the police station while the police were questioning her daughter, the undisputed trial testimony established that Gardiner was never touched by DiNunzio or O'Neill, threatened in any manner, or subjected to a show of police authority. Nor does the fact that the police officers never told Gardiner that she was free to leave render her presence at the police station a nonconsensual seizure. See Glover, 957 F.2d at 1009; United States v. Springer, 946 F.2d 1012, 1016 (2d Cir.1991). Therefore, the district court correctly concluded that, under all the circumstances, Gardiner was free to leave. See, e.g., Sheppard v. Beerman, 18 F.3d 147, 153 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). Moreover, there was no evidence from which a reasonable jury could have concluded that the police officers seized Gardiner when she went to the hospital with her daughter. Accordingly, the district court correctly directed a verdict for the police officers on Gardiner's claim that she was unlawfully seized.
 
 2. Qualified Immunity
 
 14
 Gardiner's second argument on appeal is that the district court erred in granting the police officers qualified immunity with respect to their decision to remove Jackie from the school. The district court held that the officers were entitled to qualified immunity because they believed in good faith that Gardiner had consented to having Jackie removed from school. Gardiner claims that the district court erred (1) in resolving a disputed issue of material fact as to whether Gardiner had consented and (2) by applying a subjective rather than objective standard.
 
 
 15
 Qualified immunity is an affirmative defense that shields public officials from liability for their discretionary acts under certain circumstances. Public officials are entitled to qualified immunity if (1) their conduct did not violate a plaintiff's clearly established constitutional rights or (2) it was objectively reasonable for them to believe that their conduct did not violate those rights. See Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). The parties agree that in light of Gardiner's constitutionally protected liberty interest in the custody of her child, Jackie could not be removed from school by the police officers, absent a court order, an emergency, or parental consent. See, e.g., Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir.1991). Because the police officers were not acting pursuant to a court order or under emergency circumstances, the question is whether it was objectively reasonable for them to believe that Gardiner consented to having her daughter taken from the school to the police station.
 
 
 16
 As a threshold matter, Gardiner correctly argues that the district court erroneously stated the test for qualified immunity in subjective rather than objective terms. For qualified immunity to attach, it is not enough that an officer believes that his conduct comports with clearly established rights; that belief must also be reasonable. Nonetheless, although the district court misstated the standard for qualified immunity, if the police officers were in fact told by Casazza that Gardiner had consented, their reliance on her representations would have been objectively reasonable. DiNunzio testified that he had known and worked with Casazza for several years on matters involving children from the school. Moreover, in light of the importance of maintaining order in schools, it is essential that police officers and school officials can rely on each other. As such, we hold that it is objectively reasonable for police officers to rely on the representations of a school official that a parent has consented to the removal of a child from school without conducting an independent inquiry, absent unusual circumstances that would warrant such inquiry.
 
 
 17
 We thus return to the central question: whether it was objectively reasonable for DiNunzio and O'Neill to believe that Gardiner gave Casazza her consent to have Jackie taken from the school. The trial testimony is in dispute as to whether Gardiner actually provided consent to Casazza. Nonetheless, there is no dispute that Casazza told DiNunzio and O'Neill that Gardiner consented to having Jackie taken to the police station. Given the working relationship between the police officers and Casazza, the officers had no reason to believe that Gardiner did not actually consent. This is true whether or not Gardiner actually consented to her daughter's removal from school. In other words, the fact that the conversation between Casazza and Gardiner may never have occurred does not give rise to an inference that the police officers were lying with respect to what Casazza told them.
 
 
 18
 In essence, Gardiner alleges, as she did in her motion for a new trial, that Casazza and the police officers conspired to testify falsely at trial with respect to the circumstances surrounding the consent. We recognize that "conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence." Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir.1994). Instead, parties seeking to prove a conspiracy must typically rely on circumstantial evidence. See Schwimmer v. Sony Corp. of Am., 677 F.2d 946, 953 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Gardiner offers no such evidence, but simply speculates that the police officers conspired to fabricate their trial testimony. In sum, because of the absence of evidence that DiNunzio and O'Neill knew of the alleged lack of parental consent, the district court correctly granted the officers a directed verdict on the grounds of qualified immunity.
 
 CONCLUSION
 
 19
 We have considered all of Gardiner's remaining contentions and find them to be without merit. Based on the foregoing, the judgment of the district court is affirmed.
 
 OAKES, Senior Circuit Judge, dissenting:
 
 20
 The posture of this case requires me to dissent on the qualified immunity issue. The district court granted judgment as a matter of law at the close of the plaintiff's case even though, as the majority concludes, "[t]he trial testimony [was] in dispute as to whether Gardiner actually provided consent to Casazza." Opinion at 156. The majority affirms nevertheless because, it concludes, "the fact that the conversation between Casazza and Gardiner may never have occurred does not give rise to an inference that the police officers were lying with respect to what Casazza told them." Id. at 156. I am unable wholly to fathom this reasoning. If the jury might have concluded that Gardiner did not in fact give her consent to Casazza, it would take only a small inference from there, and not a particularly unreasonable one, to conclude further that Casazza and the police either misremembered or colluded when they testified at trial that Casazza had informed the officers that consent had been obtained. This conclusion is rather supported, not undermined, by the fact (relied on by the majority, supra, at 156) that the officers and Casazza had an ongoing "working relationship."
 
 
 21
 I believe the jury, having concluded that Casazza did not in fact obtain consent, would have been entitled to draw this further inference, which would have resulted in judgment for Gardiner. The only alternative inference, I think, would have been no more reasonable. Having concluded that Casazza did not obtain Gardiner's consent, the jury--I suppose--could have concluded that Casazza, on her own initiative and prior to the threat of a lawsuit, falsely informed the two police officers that she had indeed obtained consent. While it is true that, under this, the second, scenario, the police officers might have been entitled to prevail, the choice between these inferences was certainly one that the jury alone was entitled to make--in particular where, as here, the choice turned largely, if not entirely, on the jury's determination of witnesses' credibility. Accordingly, by directing a verdict against Gardiner, the district court invaded the province of the jury. By affirming, the majority takes this invasion another step. This dissent follows.