KIA P., individually and on behalf of Mora P., an infant, Plaintiffs,

v.

Rosemary McINTYRE, individually and as caseworker, Child Welfare Administration, Doren Delamothe, individually and as supervisor, Child Welfare Administration, Barbara Sabol, individually and as Commissioner of Social Services of the City of New York, Robert Little, individually and as Deputy Commissioner of Social Services of the City of New York, City of New York, Long Island College Hospital, and Susan Morance, Defendants.

No. 94–CV–0664(FB).

United States District Court, E.D. New York.

April 15, 1998.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, NY, for Plaintiffs.

Jennifer E. Bienstock, Aaronson Rappaport Feinstein & Deutsch, LLP, New York, NY, for Defendants Long Island College Hosp., Susan Morance.

Steven Friedman, Office of the Corp. Counsel of the City of New York, New York, NY, for Defendants McIntyre, Delamothe, Sabot, Little, and the City of New York.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

In this action, which arises under 42 U.S.C. § 1983 and New York state law, plaintiff Kia P. ("Kia") claims that she was unconstitutionally deprived of the custody of her daughter Mora P. ("Mora")[1] shortly after her birth at Long Island College Hospital ("Hospital") in 1993, when the Hospital, allegedly pursuant to directions from employees of the City of New York ("City"), held Mora for ten days pending its receipt of the results of a toxicology screen of the baby's urine. Kia alleges that the City and its employees have implemented a policy of re-

---

1. Plaintiff Mora P. is also referred to as "Moriah P." in certain of the submissions before the Court. In the absence of any definitive statement regarding the correct spelling of her first name, the Court will refer to her by the name chosen for the caption of this lawsuit.

moving children from their parents upon suspicion of child abuse without probable cause or due process of law, in violation of the Fourth and Fourteenth Amendments of the Constitution. Pending before the Court are two summary judgment motions pursuant to Rule 56 of the Federal Rules of Civil Procedure. One has been brought by defendants City, Rosemary McIntyre ("McIntyre"), Doren Delamothe ("Delamothe"), Barbara Sabol ("Sabol"), and Robert Little ("Little") (collectively "the City defendants"). The other has been brought by the Hospital and Susan Morance ("Morance") (collectively "the Hospital defendants"). Because the Court concludes that none of the defendants violated plaintiffs' constitutional rights, the motions for summary judgment are granted and the complaint is dismissed. As alternative grounds for dismissal, in respect to the individual City defendants, the Court holds that they are immune from liability, either because they were not personally involved in the constitutional violations alleged to have occurred or by virtue of the doctrine of qualified immunity.

## BACKGROUND

The Court's recitation of the facts is drawn from the Statements of Undisputed Facts submitted by the parties pursuant to Local Rule 56.1 (formerly Local Rule 3(g)) and the documentary evidence contained in their motion papers. Unless otherwise indicated, the facts are undisputed.

On March 27, 1993, Kia went to the Hospital in labor, and Mora was born later that day. Kia had received prenatal care through a program at North Central Bronx Hospital. Kia informed Hospital personnel upon admission that she was HIV positive. Kia alleges that she was treated discourteously as a result of her HIV status.

Shortly after Mora's birth, the Hospital took a sample of Mora's urine, which tested positive for methadone. On March 29, 1993, defendant Morance, a Hospital social worker, informed Kia of the positive test results. Kia denied having taken methadone during her pregnancy. As was its practice, the Hospital thereupon sent Mora's urine sample to an outside laboratory for confirmatory testing.

The record reflects it was "very rare" for confirmatory tests to fail to detect the presence of drugs in a urine sample. Reply Declaration of Steven Friedman at Exh. "A." Kia was released from the Hospital on March 29, 1993. However, the Hospital continued to hold Mora pending the anticipated urine test confirmation. Moreover, there is undisputed evidence in the record that an infant's methadone withdrawal can take a minimum of one week to manifest itself. Hospital records indicate that Mora exhibited tremors and irritability, which are symptoms consistent with methadone withdrawal.

Also on March 29, 1993, Morance reported the positive urine toxicology screen to the New York State Central Register of Child Abuse and Maltreatment ("Central Register"), which in turn notified the Child Welfare Administration ("CWA"). Defendant McIntyre was the caseworker assigned by CWA to investigate the matter. On March 30, 1993, she visited Kia's home in Brooklyn and interviewed Kia and her husband, Edwin, since deceased. Kia denied having used drugs during her pregnancy or having participated in a methadone program, although she admitted to having habitually used crack cocaine, but not during the past two years. Edwin similarly denied having used any illegal drugs for the past two years. McIntyre kept in contact with the Hospital, telephoning Morance on March 31, 1993 to inform her that Kia had adamantly denied using drugs during her pregnancy. Morance advised McIntyre that the baby's urine sample had been sent out for confirmatory testing, and that the results were expected by April 5, 1993. Defendant Delamothe, one of McIntyre's supervisors, denied that CWA ever told the Hospital to place a "hold" on Mora's release. However, Cyprian Belle, a deputy director of the City's Agency for Children's Services, testified at his examination before trial that CWA had a policy in 1993 that a child who was the subject of a pending CWA investigation could not be released from a hospital until CWA gave its permission.

The confirmatory testing of Mora's urine was delayed because SmithKline Beecham, the laboratory to which the sample was initially sent, was unable to complete the

screening due to the small quantity of urine in the sample. The sample was consequently sent to National Medical Services for analysis by gas chromatography/mass spectrometry ("GCMS"), a more sophisticated test than the test conducted by the Hospital. In the meantime, according to Hospital records, Hospital personnel continuously monitored Mora in order to determine whether she was suffering from methadone withdrawal. It is uncontested that while Mora remained in the Hospital, Kia was permitted to, and did, visit Mora, including during feeding times.

Ultimately, National Medical Services reported that it could not confirm the presence of methadone in the baby's urine. There is some dispute in the record as to whether the Hospital received these tests results on April 6 or 7, 1993. In any event, Mora's doctors cleared her for discharge on April 7, 1993, and this information was forthwith communicated to Morance. Morance promptly contacted McIntyre to advise her that Mora had been medically cleared for discharge. CWA determined that it did not intend to take any action in respect to Mora's case, and this information was communicated to the Hospital on April 8, 1993. Mora was discharged from the Hospital on that day. By letter dated June 5, 1993, the State Department of Social Services advised Kia that no credible evidence had been found that Mora had been abused or maltreated, and all identifying information was expunged from the Central Register. This action followed.

Plaintiffs' complaint invokes all of the provisions of the Constitution which arguably impact upon the separation of a child from the custody and care of a parent, as well as related New York State law provisions. They are contained in seven claims: *first,* that defendants City, Sabol, as Commissioner of the City's Department of Social Services, Little, as Deputy Commissioner of the Department of Social Services and the Director of the CWA, and the Hospital had a policy of detaining children without due process of law

or probable cause, and that defendants McIntyre, Delamothe and Morance removed Mora from Kia's custody pursuant to this policy in violation of plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution;[2] *second,* that defendants conducted a constitutionally inadequate investigation of the charges against Kia and that the removal of Mora from Kia's custody was based upon this inadequate investigation; *third,* that defendants failed to provide services mandated by New York State law to reunite Kia and Mora; *fourth,* that defendants unlawfully interfered with Kia's custody of Mora; *fifth,* that defendants unlawfully imprisoned Mora; *sixth,* that defendants' inadequate investigation of the charges against Kia constituted a gross breach of duty and a gross deviation from accepted professional standards; and *seventh,* that defendants discriminated against Kia because of her HIV status.

The City defendants contend that: (1) they did not violate plaintiffs' due process rights; (2) plaintiffs had no constitutional right to an adequate investigation; (3) plaintiffs' claim that the City defendants failed to provide statutorily-mandated preventive services fails to state a claim for which relief may be granted; (4) plaintiffs have failed to demonstrate the existence of a municipal policy, practice or custom; (5) the individual City defendants are immune from liability based upon the law of qualified immunity; and (6) the Court should decline to exercise supplemental jurisdiction over the state law claims.

The Hospital defendants contend that: (1) the Hospital is not a state actor for purposes of liability under § 1983; (2) plaintiffs have no constitutional right to an adequate child abuse investigation; (3) the state law claims should be dismissed; and (4) the seventh claim for relief, based upon unlawful discrimination, should be dismissed based upon plaintiffs' failure to offer any factual basis for this claim.

**2.** The Fifth Amendment applies only to the federal government; therefore, allegations of "federal action" are required to state a claim for deprivation of due process in violation of the Fifth Amendment. *See Flowers v. Webb,* 575 F.Supp. 1450, 1456 (E.D.N.Y.1983). There are no such allegations in this case. Apparently in recognition of this legal principle, plaintiffs confine their arguments in opposition to the summary judgment motions to defendants' alleged violations of their constitutional rights under the Fourth and Fourteenth Amendments.

Plaintiffs counter that: (1) disputed questions of fact preclude an award of summary judgment; (2) by interfering with Kia's liberty interest in the care and custody of Mora, defendants violated plaintiffs' rights to substantive due process; (3) by detaining Mora without a hearing, defendants deprived plaintiffs of their right to procedural due process; (4) the Fourth Amendment protection against unreasonable searches and seizures applies to this case; (5) qualified immunity is not appropriate because of contested issues of material fact; (6) the Court should continue to exercise jurisdiction over the state law claims, which, in any event, are not ripe for dismissal; and (7) the Hospital is a proper party under § 1983.

## DISCUSSION

### I. Standard on a Motion for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp., supra,* at 323. All ambiguities must be resolved, and all inferences drawn, in favor of the non-moving party. *See Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997). The judge's role in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Beatie v. City of New York,* 123 F.3d 707, 710–711 (2d Cir. 1997). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), quoting Fed.R.Civ.P. 56(e) (emphasis in original) (other citations omitted).

### II. 42 U.S.C. § 1983

It is well established that the elements of a claim under § 1983 are: (1) that the conduct in question deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States; and (2) that the conduct complained of was committed by a person acting under color of state law. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Because "[s]ection 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred[,]' ... [t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). However, this inquiry presupposes that the § 1983 defendant acted under color of state law. "A private defendant may be held liable only as 'a willful participant in joint activity with the State or its agents.' " *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992) (quoting *Adickes,* 398 U.S. at 152). In this case, the Hospital defendants argue as a threshold matter that they are not proper parties to this § 1983 action because they are not state actors. Thus, before turning to a consideration of plaintiffs' constitutional claims, the Court first examines whether the Hospital defendants are state actors who may be subject to liability under § 1983.

### A. Are the Hospital Defendants "State Actors"?

There is some support for the Hospital's contention that a hospital providing medical services is ordinarily not a state actor under § 1983, even when the action at issue is the hospital's notification to govern-

ment officials of suspected child abuse. *See Deckon v. Chidebere,* 1995 WL 555684, at *4 (S.D.N.Y. Sept.19, 1995), *aff'd,* 101 F.3d 1393 (2d Cir.1996); *Thomas v. Beth Israel Hosp., Inc.,* 710 F.Supp. 935, 940 (S.D.N.Y.1989). However, there is also ample authority to the effect that "[j]oint interference of state agents and private parties with private rights constitutes state action attributable to both public and private sector participants." *Suss v. American Soc'y for the Prevention of Cruelty to Animals,* 823 F.Supp. 181, 186 (S.D.N.Y.1993); *see also Perez v. Sugarman,* 499 F.2d 761, 764–65 (2d Cir.1974); *Koltz v. Bezmen,* 822 F.Supp. 114, 117 (E.D.N.Y. 1993); *Ruffler v. Phelps Memorial Hosp.* 453 F.Supp. 1062, 1067 (S.D.N.Y.1978). As the Second Circuit stated in *Perez:*

> [C]onduct which is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action .... In certain instances the actions of private entities may be considered to be infused with "state action" if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties.

*Perez,* 499 F.2d at 764–65 (2d Cir.1974) (quoting *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)).

■ The Court agrees with the Hospital that insofar as its employees provided medical care to Mora during her hospitalization, it did not engage in state action that would subject it to liability under § 1983. However, the Hospital did more than simply treat Mora. Morance testified at her examination before trial that once a case has been referred to CWA, the Hospital will not release a child, even if he or she has been medically cleared for release, without the prior approval of CWA. Morance's testimony is corroborated by the Hospital's Policy and Procedure Manual, which provides, in pertinent part, that if the Central Register accepts a case and refers it to the local CWA office, as here, "the [Hospital] social worker will so document in the chart and the child will be admit-

ted and held pending the outcome of the local CWA's field unit's investigation." Plaintiffs' Answering Submissions at Exh. "C." Finally, as noted above, CWA apparently had a policy in 1993 that it had to approve a child's release from a hospital if the child was the subject of an ongoing investigation. It is apparent, therefore, that in 1993, the Hospital had implemented a policy of holding children who were the subject of child abuse investigations, even if there was no medical reason for doing so, until it received notification from the CWA that its investigation was complete. Under those circumstances, the Court determines that the Hospital and its employees were performing a function that was essentially public in nature. But for the actions of the Hospital in holding Mora, the CWA presumably would have needed to take some action to detain the child pending completion of its investigation or would have needed to determine on an expedited basis whether she should have been released to Kia. Accordingly, the Court determines that the Hospital's practices in this regard were sufficiently "entwined" with City policy to warrant its being treated as a state actor for purposes of this action. *See Perez,* 499 F.2d at 765. The Court, therefore, rejects the Hospital defendants' claim that they are not proper parties to this § 1983 action, and will accordingly determine whether their actions in detaining Mora, together with the actions of the City defendants, violated plaintiffs' constitutional rights.

## B. Have the Plaintiffs' Constitutional Rights Been Violated?

Plaintiffs specifically invoke the Constitution in respect to their first, second, and seventh claims. In their first claim, plaintiffs claim that defendants infringed their rights to substantive and procedural due process under the Fourteenth Amendment and Mora's right to be free from unreasonable searches and seizures under the Fourth Amendment. In their second claim, plaintiffs assert that defendants violated their alleged constitutionally-protected right to an adequate child abuse investigation. In plaintiffs' seventh claim, they allege that defendants discriminated against them because of Kia's HIV status, in violation of the Equal

Protection Clause of the Fourteenth Amendment. Although plaintiffs' fourth claim, alleging defendants' interference with Kia's custody of Mora, does not specifically invoke the Constitution, it does appear to raise identical constitutional concerns as are implicated in plaintiffs' first claim. The Court will consider each of these constitutional contentions in turn.

■ As a preface to the Court's treatment of plaintiffs' Fourteenth Amendment substantive and procedural due process claims and their Fourth Amendment search and seizure claims, it is conceptually important to recognize that they are all triggered by the liberty interests implicated whenever the state intrudes upon "the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman,* 566 F.2d 817, 824 (2d Cir.1977); *see also Joyner v. Dumpson,* 712 F.2d 770, 777–78 (2d Cir.1983); *Zappala v. Albicelli,* 954 F.Supp. 538, 544 (N.D.N.Y.1997); *Tenenbaum v. Williams,* 862 F.Supp. 962, 969 (E.D.N.Y. 1994). Consequently, "parents have a fundamental, constitutionally protected liberty interest in the custody of their children." *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). This liberty interest does not belong exclusively to parents. Rather, "this right encompasses both a parental interest in the companionship, custody, and care of the children and those 'of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association with the parent.'" *Defore v. Premore,* 863 F.Supp. 91, 94 (N.D.N.Y. 1994), *aff'd,* 86 F.3d 48 (2d Cir.1996) (quoting *Duchesne,* 566 F.2d at 825).

### 1. Due Process

#### a. Substantive Due Process

■ While the Supreme Court has recently explained that "'[a]s a general matter ... [it] has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended,'" it has, nonetheless, steadfastly recognized that "[t]he protections of substantive due process have ... been accorded to matters relating to marriage, family, procreation and the right to bodily integrity." *Albright,* 510 U.S. at 271–72 (quoting *Collins v. Harker,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Consequently, "freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. La-Fleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

■ "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995) (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994)). In *Joyner v. Dumpson* and *Gottlieb v. County of Orange, supra,* both of which involved the exercise of parental rights, the Second Circuit conflated the substantive due process analysis into a balancing of the liberty interests subsumed by the special nature of the parent-child relationship against the state's interest in protecting the child's health and safety. In *Joyner,* the court applied a three-part test to determine whether certain provisions of New York's Social Services Law infringed plaintiffs' custody rights. *See also Tenenbaum,* 862 F.Supp. at 969 (applying same three-part test to claim that removal of child violated parents' right to substantive due process). First, the court identified the interest at stake in order to determine whether the interest constituted a "fundamental right" for purposes of the Fourteenth Amendment. Second, the court looked to whether the state's action had "significantly infringed" the fundamental right. *Joyner,* 712 F.2d at 777. Finally, the court looked to whether an important state interest justified the infringement. In *Gottlieb,* the Second Circuit, while not expressly invoking the three-part test relied upon in *Joyner,* essentially engaged in the same inquiry, looking first to the nature of the parent's right to custody, and then observing that this right must give way when "there is an objectively reasonable basis for believing that parental

290

custody constitutes a threat to the child's health or safety." *Gottlieb,* 84 F.3d at 511. This governmental concern derives from " 'the interest of the State in protecting and caring for children who are being neglected.' " *Dietz v. Damas,* 932 F.Supp. 431, 450 (E.D.N.Y.1996), *reargument granted and decision aff'd,* 948 F.Supp. 198 (E.D.N.Y.1996) (quoting *Newton v. Burgin,* 363 F.Supp. 782, 786 (W.D.N.C.1973) (three-judge panel), *aff'd,* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974)). Accordingly, the Court analyzes plaintiffs' substantive due process claims in accordance with the framework employed in *Joyner* and conceptually embraced in *Gottlieb.*

■ The Court determines, as a matter of law, that plaintiffs' rights were not "significantly infringed" by the defendants' actions. CWA took no formal action to take custody of Mora from Kia. Rather, the nature of the limitation upon Kia and Mora's rights was limited to a "hold" on Mora's discharge pending an anticipated confirmation of the toxicology results and the sensible need to observe Mora for withdrawal symptoms. Notably, Kia was permitted to visit with Mora for the duration of Mora's hospitalization, including feeding times. Moreover, and most significantly, the results of the initial toxicology screen, taken together with Kia's history of substance abuse, gave the Hospital and CWA a reasonable basis to believe that Mora was in danger of abuse or neglect, and clearly justified their limited actions. Plaintiffs' argument that the screening test used by the Hospital was not "state of the art" does not in any way compel the conclusion that the defendants' fears for Mora's health and welfare were not reasonable. Although it is uncontested that the GCMS testing used by the outside laboratories was more accurate, there is, as noted above, uncontested evidence in the record that the Hospital routinely sent samples for confirmation whenever the mother denied having used drugs during pregnancy, and that, even in 1993 when the test at issue was administered, it was very rare for urine tests sent to outside laboratories for confirmation not to come back positive.

As the Second Circuit aptly observed in *van Emrik v. Chemung County Dep't of Social Servs.,* 911 F.2d 863, 866 (2d Cir.1990):

Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

Given the delicacy of this balance, the Court concludes that the limited nature of the infringement upon plaintiffs' respective familial rights did not amount to a denial of substantive due process under the three-part test used by the Second Circuit in *Joyner* and the concept of "objective reasonableness" articulated by the Circuit in *Gottlieb. See also Deckon,* 1995 WL 555684, at *5. Accordingly, defendants are entitled to summary judgment dismissing plaintiffs' substantive due process claims.

### b. Procedural Due Process

■ The liberty interests of parent and child in continued care and companionship has both procedural as well as substantive elements. *van Emrik,* 911 F.2d at 865; *Gottlieb,* 84 F.3d at 518–22; *Schwimmer v. Kaladjian,* 988 F.Supp. 631, 640 (S.D.N.Y. 1997). Accordingly, the Second Circuit, as reflected by *van Emrik* and *Gottlieb,* has typically undertaken discrete procedural and substantive due process analyses.

■ The focus of the procedural due process inquiry in this case is whether Kia was entitled to a hearing regarding the Hospital's decision to hold Mora pending the results of the anticipated confirmatory toxicology screen. As to whether a *pre-deprivation* hearing was required, the Court notes that while "[a] parent may not lawfully be deprived of the custody of his or her child without a hearing 'at a meaningful time and in a meaningful manner,' " *Gottlieb,* 84 F.3d at 520 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62

(1965)), it is well established that "government officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." *Id.; see also Spencer v. Lavoie,* 986 F.Supp. 717, 721–22 (N.D.N.Y.1997) ("[A]ppropriate government officials may effect a temporary deprivation of custody, without parental consent or a court order, when presented with 'emergency' circumstances"); *Dietz,* 932 F.Supp. at 444 ("The law of this Circuit, as well as of other federal courts, is clear that, constitutionally, no prior hearing is required to remove a child from parental custody in an emergency situation."). "There is a sufficient emergency to warrant official's taking custody without a prior hearing if a child is immediately threatened with harm or is bereft of adequate care or supervision." *Robison v. Via,* 821 F.2d 913, 922 (2d Cir.1987).

The Court concludes that the results of the positive toxicology screen gave defendants an adequate emergency basis for detaining Mora since the initial results provided an objective basis for the Hospital's concern that Mora had been exposed to drugs *in utero.* Accordingly, the Court determines that no pre-deprivation hearing was required. Having reached this conclusion, the question that remains is whether plaintiffs' procedural due process rights were violated by the Hospital's failure to conduct a hearing after it determined to detain the child. Although plaintiffs argue in this regard that defendants should have complied with New York State requirements regarding the removal of children on an emergency basis,[3] the Second Circuit has held that a violation of state law, even if proved, does not give rise to a § 1983 claim since it is wholly separate from the issue of whether the defendants violated plaintiffs' procedural due process rights under the United States Constitution. *See Doe v. Connecticut Dep't of Child and Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990); *Robison,* 821 F.2d at 922; *Dietz,* 932 F.Supp. at 453.

The Court therefore turns to federal authority mapping out the contours of procedural due process. The Supreme Court has long held that three separate factors enter into a determination as to the procedural protections the Constitution requires in a given case: first, "the private interest ... affected by the official action"; second, "the risk of an erroneous deprivation of such interest ... and the probable value, if any, of additional or substitute procedural safeguards"; and third, the government's interest. *See Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Under the circumstances present here, in light of the imminence of the test results and the probability of confirmation, there was a minimal risk that plaintiffs would be erroneously deprived of their liberty interests and there was no pragmatic reason to implement any particular procedural safeguard. Furthermore, while defendants awaited the expected confirmatory test results, their interest in protecting Mora from the risk of child abuse perdured.

On balance, the Court concludes, as a matter of law, that plaintiffs' post-deprivation procedural due process rights were not infringed, primarily because it was rational to hold Mora on a day-by-day basis pending the receipt of the anticipated confirmatory test results. As it turned out, no hearing was ever held because Mora was released to Kia's

---

3. Specifically, plaintiffs cite the New York Family Court Act § 1026(c), which relates to emergency removal of a child from his or her home, and provides that when the City removes a child on an emergency basis, it is required to commence court proceedings "forthwith." Plaintiffs also cite to New York Social Services Law § 417, entitled "Taking a child into protective custody." Section 417(2) provides, in pertinent part, that "the person in charge of any hospital ... shall, where he has reasonable cause to believe that the circumstances or conditions of the child are such that continuing in his place of residence or in the care and custody of the parent, guardian, custodian or other person responsible for the child's care presents an imminent danger to the child's life or health, take all necessary measures to protect the child including, where appropriate, retaining custody of an abused or maltreated child, until the next regular week day session of the family court in which a child protection proceeding pursuant to article ten of the family court act may be commenced ...."

292

custody once the test results were received by the Hospital. The Court notes that there is a fair amount of precedent for rejecting procedural due process claims based upon comparable periods of delay under related circumstances. *See Cecere v. New York,* 967 F.2d 826 (2d Cir.1992) (four-day delay); *van Emrik, supra* (eight-day delay); *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983) (12–day delay); *Dietz, supra* (12–day delay). Accordingly, defendants are entitled to summary judgment dismissing plaintiffs' procedural due process claim.

### 2. Fourth Amendment

The Fourth Amendment prohibition against unreasonable searches and seizures is the quintessential safeguard of one's liberty. *See, e.g., Albright,* 510 U.S. at 274; *Murphy v. Lynn,* 118 F.3d 938, 944 (2d Cir.1997). Notably, in a case also involving the investigation of child abuse, the Court of Appeals for the Seventh Circuit observed that whether plaintiffs' constitutional claim is pleaded as a violation of the Fourth Amendment or as a due process violation under the Fourteenth Amendment, "the same basic analysis is utilized"—the Court "must essentially weigh the privacy interest of the family member against the interests of the government." *Darryl H. v. Coler,* 801 F.2d 893, 901 n. 7 (7th Cir.1986).

Preliminarily, it is clear that Kia does not have standing to assert a derivative or vicarious Fourth Amendment claim based upon defendants' search or seizure of Mora, but she does have standing to assert a Fourth Amendment claim on Mora's behalf. *See Tenenbaum,* 862 F.Supp. 962, 973–74. As to Mora, plaintiffs apparently raise two claims: first, that administering the urine test was an illegal search; and second, that Mora's detention in the Hospital was an illegal seizure. The Court will consider each of these arguments in turn.

In respect to the Hospital's decision to administer the urine test, although the Fourth Amendment is triggered when state authorities have children undergo medical procedures for investigative purposes, *see van Emrik,* 911 F.2d at 867, the record here indicates that the urine test was not ordered by CWA and was given for medical and not investigative purposes. *See Chayo v. Kaladjian,* 844 F.Supp. 163, 169–70 (S.D.N.Y.1994). Consequently, the Court concludes that the administration of the urine test did not constitute a "search" of Mora in violation of the Fourth Amendment.

The Court now turns to the question of whether the "hold" placed on Mora's release constituted a Fourth Amendment "seizure." The Second Circuit has indicated that an individual is seized if, under the circumstances presented, " 'a reasonable person would have believed that he was not free to leave.' " *Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 155 (2d Cir.1995). Kia was not free to take Mora home on March 29, 1993, when Kia was cleared for discharge. Moreover, the Court has already determined that when the Hospital acted to detain Mora, the detention, because it was "entwined" with governmental policies, took on the character of state action. Accordingly, the Court concludes that Mora was seized within the meaning of the Fourth Amendment.

In determining the reasonableness of a seizure, "the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.' " *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Similar to the standard governing the substantive and procedural due process analysis articulated by the Second Circuit in *Gottlieb,* this inquiry requires the Court to determine whether the defendants' actions were "objectively reasonable" in light of the facts and circumstances confronting them. *Graham,* 490 U.S. at 397. Whether a seizure is unreasonable is a determination that can be made as a matter of law. *See, e.g., Drake v. Delta Airlines, Inc.,* 923 F.Supp. 387, 397 (E.D.N.Y.1996); *see also Alber v. Illinois Dep't of Mental Health and Developmental Disabilities,* 816 F.Supp. 1298, 1305 (N.D.Ill. 1993) (holding that in the absence of "specific

evidence tending to show that the allegations of child abuse were fabricated and that the defendants knew that such allegations were untrue ... the plain bona fides of the official action make the assumed seizures reasonable as a matter of law for purposes of Fourth Amendment ... analysis") (citing *Snell v. Tunnell,* 920 F.2d 673, 698 (10th Cir.1990)).

 As the Court has already discussed in respect to plaintiffs' due process claims, the governmental interest in protecting children from the effects of child abuse, including prenatal exposure to drugs, is an exceedingly strong one, *see, e.g., Deckon,* 1995 WL 555684, at *5, and balanced against that interest, any intrusion upon Mora's interests was minimal. Under the particularized facts of this case, the defendants' actions were objectively reasonable. Accordingly, Mora's Fourth Amendment seizure rights were not violated. Therefore, defendants are entitled to summary judgment dismissing all of plaintiffs' Fourth Amendment claims, which consequently disposes of the first and fourth claims of the complaint in their entirety.

### 3. Right to an Adequate Child Abuse Investigation

 In their second claim, plaintiffs contend that their right to an adequate child abuse investigation was violated by the defendants' actions. As the district court noted in *Tenenbaum,* the Constitution does not grant plaintiffs such an independent right; rather, allegations of inadequate investigation invoke plaintiffs' right to be free of unreasonable searches and seizures in violation of the Fourth Amendment. *Tenenbaum,* 862 F.Supp. 962, 978. Accordingly, the Court concludes that its analysis of plaintiffs' Fourth Amendment claims similarly disposes of this claim. Defendants are consequently entitled to summary judgment dismissing the second claim of plaintiffs' complaint.

### 4. HIV Discrimination

In their seventh claim, plaintiffs allege that Mora was removed from Kia's care because of her positive HIV status in violation of the

Equal Protection Clause of the Fourteenth Amendment. In her affidavit in opposition to defendants' motions, Kia claims that Hospital employees treated her contemptuously because she was HIV positive, expressed an unwillingness to give her anesthesia, left her alone for extended periods of time, and did not tend to her medical needs following Mora's delivery. However, there are no factual allegations whatsoever offered in support of plaintiffs' claim that Mora's detention in the Hospital had anything to do with Kia's HIV status. Nor is there any factual support offered to substantiate plaintiffs' allegations that the City defendants discriminated against Kia based upon her HIV status. Conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Finnegan v. Board of Educ. of the Enlarged City Sch. Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994); *see also Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Accordingly, defendants' motions for summary judgment dismissing the seventh claim are granted.[4]

In conclusion, the Court determines that none of the plaintiffs' constitutional rights were violated by the defendants' actions. Moreover, contrary to plaintiffs' arguments in opposition to defendants' summary judgment motions, there are no material issues of fact that would preclude the Court from awarding judgment as a matter of law dismissing all of plaintiffs' federal claims. The factual issues identified by plaintiffs—whether Kia was an unfit mother, whether she was administered a drug during labor that could have affected the results of the urine screen, whether Mora was held for medical or "social" reasons, or both, and others—do not affect the availability of summary judgment because even if resolved in plaintiffs' favor for purposes of these motions, they do not give rise to questions of fact that require a trial of plaintiffs' constitutional claims.

### C. Are the individual City Defendants otherwise immune from suit?

In addition to concluding that plaintiffs' constitutional rights were not violated, the

4. Although not explicitly addressed by the parties, any perceived § 1983 claim against the Hospital based upon the medical care it rendered Kia would be subject to dismissal since, as the

Court has already noted, a hospital providing medical services is not, without more, a state actor under § 1983. *See Deckon,* 1995 WL 555684, at *4.

Court also determines, in any event, that the § 1983 claims must be dismissed against each of the individual City defendants in their individual capacities.

### 1. Personal Involvement

City Defendants Sabol and Little are sued individually as well as in their official capacities. Plaintiffs allege that Sabol and Little, in their roles as policymakers for the City Department of Social Services and CWA, respectively, created the City policies under which the constitutional violations allegedly at issue in this case occurred. Insofar as plaintiffs sue these defendants individually, it is well-settled that a defendant's personal involvement in an alleged constitutional violation is a prerequisite to the imposition of damages under § 1983. *See Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1066 (2d Cir.1989); *Chayo,* 844 F.Supp. at 172. The fact that these defendants may have been in high positions of authority is not sufficient to subject them to personal liability under § 1983. *See Al–Jundi,* 885 F.2d at 1065. Apart from the allegations of the Complaint, there is absolutely no evidence in the record that these two defendants were personally involved in the actions giving rise to this case. Accordingly, plaintiffs' § 1983 claims, to the extent that they are asserted against these defendants in their individual capacities, should be dismissed on this alternative basis.

### 2. Qualified Immunity

The Court also concludes that the actions of Delamothe and McIntyre, the individual City defendants who are alleged to have participated directly in the detention of Mora, fall within the scope of the qualified immunity doctrine.[5] Qualified immunity "generally shields governmental officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 127 (2d Cir.1997). Qualified immunity protects government officials from the burdens of defending lawsuits that are ultimately determined to be insubstantial, and also guards against the risk that "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

"Objective reasonableness" is the linchpin of the qualified immunity analysis embraced by the Supreme Court and the Second Circuit. Indeed, the Second Circuit has specifically noted that in qualified immunity cases, "we are not concerned about the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon,* 66 F.3d at 421; *see also Ricciuti,* 124 F.3d at 127–28; *Estate of Rosenbaum v. City of New York,* 975 F.Supp. 206, 215 (E.D.N.Y.1997). Even if the scope of the

---

5. Qualified immunity is an affirmative defense to a § 1983 action that must be pleaded by the defendants. *See Gomez,* 446 U.S. at 640; *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997). Although the individual city defendants pleaded this affirmative defense in their Answer, Morance, the only individual Hospital defendant, did not. The Second Circuit has held that a failure to raise qualified immunity as an affirmative defense "results in 'the waiver of that defense and its exclusion from the case.'" *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1278, at 339 (1969)); *see also McCardle,* 131 F.3d at 51 ("The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity" (citations omitted)); *Blissett v. Coughlin,* 66 F.3d 531, 538 (2d Cir.1995) ("[B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine which claims, if any, may be disposed of by summary judgment, or, at least, which facts material to the qualified immunity defense must be presented to the jury to determine its applicability once the case has gone to trial."). Therefore, the Court limits its discussion to whether the individual City defendants are entitled to qualified immunity.

plaintiffs' rights and the defendant's conduct were established at the time of the alleged violation, a government officer will nonetheless be protected from liability if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon,* 66 F.3d at 420 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The law is clear that the question of whether a reasonable officer should have known that he or she acted unlawfully is a question for the Court and not for the jury, and is properly resolved on a motion for summary judgment. *See Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Tierney v. Davidson,* 133 F.3d 189, 194 (2d Cir.1998); *Lee v. Sandberg,* 136 F.3d 94, 101–02 (2d Cir.1997); *Davidson v. Scully,* 114 F.3d 12, 14 (2d Cir. 1997); *Lennon,* 66 F.3d at 421–22. Summary judgment is therefore appropriate if:

the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

*Davidson,* 114 F.3d at 14 (quoting *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996)).

██ In this case, McIntyre, as supervised by defendant Delamothe, is alleged to have participated in Mora's detention. Specifically, it is alleged that even after Mora was medically cleared for discharge, she was held at the behest of McIntyre until the CWA could determine whether it would be taking any action against Kia. Again, plaintiffs point out that CWA apparently had a policy that children who were the subject of ongoing child abuse investigations were not to be released from hospitals without CWA permission.

As noted above, both Kia and Mora had clearly established constitutionally protected liberty interests under both the Fourteenth and Fourth Amendments. However, as is clear from the foregoing discussion of plaintiffs' constitutional claims, the Court concludes that defendants Delamothe and McIntyre, the only City defendants alleged to have participated directly in the CWA's handling of Mora's case, acted objectively reasonably, and that they are consequently immune from personal liability under § 1983. Their actions were based upon the objective findings of a laboratory test, which, once disputed, were immediately sent to an outside laboratory for anticipated confirmation. McIntyre made a prompt visit to Kia's house and interviewed Kia and her husband. Upon completion of the interview, she contacted Morance to inform her that Kia had vehemently denied taking drugs during her pregnancy. Once the unexpected non-confirmatory results were received, McIntyre and Delamothe promptly decided that CWA was not going to pursue an investigation of the child abuse charges against Kia, and so notified the Hospital. As the Second Circuit noted in *Defore v. Premore,* 86 F.3d 48, 51 (2d Cir.1996):

We can well understand the distress of the parents that their child was in the custody of public officials on the basis of ... allegations that were ultimately determined to be unfounded. But the proper means to challenge such assertions of public authority are by recourse to state courts to test continued public custody, not to seek to hold publicly employed caseworkers liable for damages.

Thus, in light of the compelling nature of the government's interest in the prevention of child abuse, the Court determines that the actions of Delamothe and McIntyre were both reasonable and appropriate, and that "no rational jury could fail to conclude that it was objectively reasonable for [them] to believe that they were acting in a fashion that did not violate a clearly established right." *Davidson,* 114 F.3d at 14; *see also Tierney,* 133 F.3d at 196.

**CONCLUSION**

For the foregoing reasons, the Court grants defendants' motions for summary judgment in respect to all of plaintiffs' ex-

296

pressed federal claims, namely, their first, second and seventh claims. To the extent that plaintiffs' fourth claim also raises constitutional arguments, it is also dismissed. Since the sole source of federal jurisdiction over this case is the § 1983 claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. 28 U.S.C. § 1367(c)(3) (district courts may decline supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction"); *see Choe v. Fordham Univ. Sch. of Law*, 81 F.3d 319 (2d Cir.1996).

Accordingly, the Court dismisses plaintiffs' complaint in its entirety.

**SO ORDERED.**