CHI CHAO YUAN, individually and on behalf of Marc Lui and Derick Lui, infants, Plaintiff,

v.

Rose RIVERA, individually and as caseworker, Child Welfare Administration, Maria Concepcion, individually and as supervisor, Child Welfare Administration, Barbara Ditman, individually and as manager, Child Welfare Administration, Marva Hammons, individually and as Commissioner of Social Services of the City of New York, Kathryn Croft, individually and as Deputy Commissioner of Social Services of the City of New York, and City of New York, Defendants.

No. 96 Civ.6628(HB)(JCF).

United States District Court, S.D. New York.

March 25, 1999.

Carolyn A. Kubitschek, Lanser and Kubitschek, New York, NY.

Sheri Rosenberg, Asst. Corp. Counsel, New York, NY.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff, Chi Chao Yuan, brings this action individually and on behalf of her infant sons, Marc Lui and Derick Lui, pursuant to 42 U.S.C. § 1983 and New York state law, charging that the defendants unlawfully deprived her of custody of her children in violation of her due process, equal protection, and Fourth Amendment rights as well as state law. She also alleges that the unlawfully retali-

ated against her for exercising her First Amendment rights. The plaintiff alleges that these violations of her rights resulted from the City of New York's failure to train its employees or from its unlawful policies.

The parties consented to refer the case to me for all proceedings under 28 U.S.C. § 636(c). The defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, the motion is granted as to the plaintiffs' Fourth Amendment, equal protection, and retaliation claims; the individual claims against defendants Marva Hammons and Kathryn Croft; the failure to train claim against Ms. Hammons, Ms. Croft, and the City of New York; and the state law claims of interference with custody and unlawful imprisonment. The motion is denied as to the remaining claims.

*Background*

In June of 1994, Ms. Chi lived in New York City with her husband, Hong Wei Lui, and their two sons, Marc, who was three years old, and Derick, who was approximately six weeks old. Ms. Chi provided the main financial support for the family. On June 28, 1994, while Ms. Chi was away on a business trip, Derick was taken by his father to the St. Luke's–Roosevelt Hospital Center where he was admitted and examined by medical personnel. (Defendants' Local Civil Rule 56.1 Statement ("Def. 56.1 Statement") ¶ 1; Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl. 56.1 Statement") ¶ 1). The following day, Dr. Anail Danavis filed an Initial Oral Report stating that Derick had sustained "an injury to the left inner eye, bruises on the face, fractured clavicle, and

a fractured left tibia." (Def. 56.1 Statement ¶¶ 2–3; Pl. 56.1 Statement ¶ 1). In light of Mr. Lui's explanation that he dropped Derick twice in the bathtub, Dr. Danavis noted that the "injuries are suspicious." (Def. 56.1 Statement ¶ 3; Pl. 56.1 Statement ¶ 1; *see* State Central Register, attached as Exh. J to Declaration of Carolyn Kubitschek dated October 8, 1998 ("Kubitschek Decl.")). Hospital authorities reported the case to the New York State Central Registry,[1] which in turn notified the New York City Child Welfare Agency ("CWA"). On June 29, CWA assigned caseworker Rose Rivera to the case, to be overseen by Maria Concepcion, a supervisor, and Barbara Ditman, a manager.

On June 30, Ms. Rivera visited the hospital and met with Mr. Lui, Ms. Chi (who had returned to New York upon hearing that Derick was injured), and Dr. Elizabeth Watkins, one of the physicians treating Derick. (Deposition of Rose Rivera dated February 6, 1995, attached as Exh. A to Kubitschek Decl. ("First Rivera Dep."), at 10). Ms. Chi then traveled to Washington, D.C. on business and remained there from July 2 to July 7. (Def. 56.1 Statement ¶ 12; Pl. 56.1 Statement ¶ 6). On July 5, 1994, at 3:00 p.m., Derick was medically ready for discharge; however, Ms. Rivera had him held at the hospital. (Def. 56.1 Statement ¶ 8; Pl. 56.1 Statement ¶ 2). The following day, Derick's doctors ordered additional x-rays for a suspected cerebral hematoma. On July 7 Ms. Rivera filed a petition in Family Court against Ms. Chi and Mr. Lui. (Def. Rule 56.1 Statement ¶ 10; Pl. 56.1 Statement ¶ 4). The petition alleged generally that Ms. Chi and Mr. Lui had abused and neglected their son Derick. (Petition

---

**1.** In New York, the State Central Registry of Child Abuse and Maltreatment (the "State Central Registry") receives and screens initial child abuse and neglect calls. If the State Central Registry interviewer determines there is reasonable cause to suspect abuse or maltreatment, the interviewer prepares an report which is immediately transmitted to the state agency, local Child Protective Services office,

or law enforcement agency with jurisdiction. The central registry includes all information in the written report; a record of the report's final disposition, including services offered and services accepted; the plan for rehabilitative treatment; and information about persons requesting or receiving information from the register. *See* New York Social Services Law § 422.

Child Abuse Case dated July 7, 1994, attached as Exh. B to Declaration of Chi Chao Yuan dated January 15, 1997 ("Chi Decl.")). Specifically, the petition described Derick's condition, recounted Mr. Lui's story, and stated that the injuries were inconsistent with Mr. Lui's explanation. The petition then stated that "[d]ue to injuries to Derick, the sibling MARC [sic] is at risk of being abused." No particular acts by·Ms. Chi were alleged.

On the day the petition was filed, Family Court Judge Leah Ruth Marks held a preliminary hearing at which Ms. Chi and her husband were present. Based on the allegations in the petition, Judge Marks remanded both Derick and his brother Marc to CWA's custody. (Transcript of Family Court Proceedings, July 7, 1995 at 4, attached as Exh. E to Kubitschek Decl.). On July 8, Ms. Chi and her husband petitioned under § 1028 of the Family Court Act for their children's return. (Declaration of Barbara Ditman dated February 4, 1997 ("Ditman Decl."), Exh. D). Ms. Rivera testified at the hearing. (Transcript of Family Court Proceedings, July 8, 1994, attached as Exh. C to Kubitschek Decl.). Judge Marks denied the petition, and Marc and Derick (who was discharged from the hospital that day) were placed in foster care. Ms. Chi moved to dismiss the petition for facial insufficiency on July 19 (Ditman Decl., Exh. E), but the motion was denied. (Ditman Decl., Exh. H).

On July 26, Dr. Watkins wrote a letter to Ms. Ditman expanding and correcting her findings. (Def. 56.1 Statement ¶ 4; Pl. 56.1 Statement ¶ 1; Letter of Elizabeth Watkins dated July 26, 1994, attached as Exh. A to Declaration of Michele Lerner dated August 28, 1998 ("Lerner Decl.")). Derick, she wrote, was admitted "with a fractured left clavicle (collar-bone), and oblique fracture through the mid-diaphysis (mid shaft) of the left tibia (medial long bone of the lower leg)"; follow-up x-rays showed "new bone formation about the distal left humerus (elbow end of the long bone of the upper arm) with an associated buckle handle fracture of the distal left humerus, and bruising on the right and left sides of his face." (Def. 56.1 Statement ¶ 5; Pl. 56.1 Statement ¶ 1). Dr. Watkins observed that the bruising on the right side of Derick's face appeared smaller and older than the bruises on the left cheek. (Def. 56.1 Statement ¶ 6; Pl. 56.1 Statement ¶ 1). She noted that a neuroradiologist who reviewed the MRI concluded that what was initially interpreted to be a cerebral hematoma caused by an earlier injury may have been only a manifestation of slow blood flow in the area. (Lerner Decl., Exh. A). However, Dr. Watkins concluded that the injuries were "characteristic of abusive fractures," and that the bruises and fractures occurred on separate occasions. (Def. Rule 56.1 Statement ¶ 7; Pl. 56.1 Statement ¶ 1; Lerner Decl., Exh. A).

On August 28, CWA filed a report stating that "Mr. Lui admitted he dropped Derick twice in the bathtub" and "mother neglected children when left while child Derick was still in the hospital and was not available when child became ready to [be] discharged." (Def. 56.1 Statement ¶ 28, Pl. 56.1 Statement ¶ 17). This information was entered in the State Central Registry.

On September 9, CWA amended the Family Court petition to include allegations specific to Ms. Chi: "The respondent mother placed the children at risk in that after being informed of the injuries to the child Derick she left the home and told the caseworker that the father would care for the children." (Chi.Decl., Exh. C). On September 19, Ms. Chi moved for custody of Marc and Derick and asserted that Mr. Lui no longer lived in their home. (Def. 56.1 Statement ¶ 34; Pl. 56.1 Statement ¶ 22). The following day the matter was further adjourned until September 26, when the case was again put over for Ms. Rivera to file a report to the court. (Ditman Decl., Exh. D). On October 3, with the defendants' consent, the court paroled the children to Ms. Chi's care under

CWA's supervision. (Def. 56.1 Statement ¶ 38; Pl. 56.1 Statement ¶ 25).

Trial began on March 3, 1995 and continued in May. (Ditman Decl., Exh. D). Judge Marks issued a decision on August 31, 1995 finding that Mr. Lui abused Derick and that "Marc was in danger of being abused as a result of his father's actions prior to the petition's filing." (Lerner Decl., Exh. L at 3). However, Judge Marks dismissed the petition against Ms. Chi, finding "no evidence that Marc was ever harmed by the acts or omissions of either parent prior to [the time Derick was injured]" and "no evidence that Mr. Lui should have been considered an improper caretaker at the time he was left to care for the children in June 1994." (Lerner Decl., Exh. L at 2). Accordingly, the judge concluded: "There is no proof on which to base any finding of abuse or neglect by Chi Chao Yuan.... That she did not foresee what would happen in her absence is regrettable, but she cannot be blamed for that." (Lerner Decl., Exh. L at 3).

The plaintiff filed a notice of claim with the New York City Law Department on November 29, 1995. (Lerner Decl., Exh. N). She then filed the present action on August 30, 1996, setting forth seven causes of action. In the first three, the plaintiff claims that the individual defendants Rose Rivera, Barbara Ditman, and Maria Concepcion (1) removed Marc and Derick from her and detained them without probable cause, without due process of law, and based on legal standards different from those applied to fathers; and unlawfully interfered with Ms. Chi's liberty interest in the care and custody of Marc and Derick, in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution (Complaint ¶¶ 46–47); (2) removed and detained her children without probable cause and based on constitutionally inadequate investigation of the child abuse charges (Complaint ¶ 56); (3) initiated abuse and neglect proceedings maliciously and without probable cause in vio-

lation of her Fourth Amendment right to be free of unlawful searches and seizures (Complaint ¶¶ 62–63); and (4) retaliated against Ms. Chi for exercising her First Amendment right to criticize the conduct of child abuse investigations. (Complaint ¶¶ 62–63).

The plaintiff alleges that the individual caseworkers acted pursuant to policies maintained by the City of New York, Marva Hammons (the Commissioner of the Department of Social Services of the City of New York ("DSS")), and Kathryn Croft (the Deputy Commissioner of DSS and the Director of CWA). (Complaint ¶¶ 44–45, 55, 62). In the alternative, the plaintiff charges that these defendants failed to adopt adequate policies regarding the removal and detention of children from their parents, including policies for the investigation of child abuse charges and the filing of child protective proceedings. (Complaint ¶¶ 49–52, 57–58, 64–65). The plaintiff also alleges that the City of New York, Ms. Hammons, and Ms. Croft provided grossly inadequate and unprofessional training to their employees. (Complaint ¶ 59).

The fourth and fifth causes of action are state law tort claims for interference with custody and unlawful imprisonment. (Complaint ¶¶ 67–72). The seventh cause of action charges defendants with gross deviation from accepted professional standards. (Complaint ¶¶ 82–83).

In the sixth cause of action Ms. Chi alleges that Ms. Rivera, Ms. Conception, and Ms. Ditman violated her rights to privacy, liberty, and reputation, and impeded her ability to obtain employment by informing the State Central Registry that she was an abusive parent. (Complaint ¶ 74). She further claims that the City of New York, Ms. Croft, and Ms. Hammons had a policy of labeling parents as abusive based upon improper, secret standards even though the parents' conduct did not amount to abuse or maltreatment under New York Law. (Complaint ¶¶ 75–79).

On January 13, 1998, the Honorable Leonard Bernikow, to whom the case was then assigned, dismissed the sixth cause of action against all defendants. However, Judge Bernikow ruled that the plaintiffs could relitigate the Family Court's finding that Mr. Lui abused Derick and rejected the defendants' argument that that finding conclusively established probable cause to remove the children. *Chi v. Rivera*, No. 96 Civ. 6628, 1998 WL 63404 (S.D.N.Y. Feb. 17, 1998). The defendants now move for summary judgment.

*Discussion*

### A. Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) (citations omitted); *see also Adickes*, 398 U.S. at 158–59, 90 S.Ct. 1598. But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Id.* at 249–50, 106 S.Ct. 2505. In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. Claims under 42 U.S.C. § 1983

The plaintiff seeks damages pursuant to 42 U.S.C. § 1983 against the City of New York and individual City employees. Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Adickes*, 398 U.S. at 150, 90 S.Ct. 1598; *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993). Because "section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred[,]' [t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *see Sykes*, 13 F.3d at 519. To prevail, the plaintiffs must establish that the person depriving them of these rights acted under color of state law. *See* 42 U.S.C. § 1983, *Gomez v. Toledo*, 446 U.S. 635, 639, 100

S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sykes,* 13 F.3d at 519.

The plaintiff alleges that the defendants violated her and her children's Fourteenth Amendment due process rights, their Fourth Amendment rights to be free from unlawful seizure and malicious prosecution, their equal protection rights, and their First Amendment rights. To recover against the City employees in their individual capacities, the plaintiff must also overcome the affirmative defense of qualified immunity.

### C. Due Process

The plaintiff's procedural and substantive due process claims derive from the liberty interest implicated whenever the state intrudes upon "the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977); *see also Joyner v. Dumpson,* 712 F.2d 770, 777–78 (2d Cir.1983). "It is the interest of the parent in the 'companionship, care, custody and management of his or her children,' and of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association,' with the parent [.]" *Duchesne,* 566 F.2d at 825 (internal citations omitted); *see also Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) ("parents have a fundamental, constitutionally protected liberty interest in the custody of their children"); *Kia P. v. McIntyre,* 2 F.Supp.2d 281, 289 (E.D.N.Y.1998); *Defore v. Premore,* 863 F.Supp. 91, 94 (N.D.N.Y. 1994), *aff'd,* 86 F.3d 48 (2d Cir.1996).

### 1. Procedural Due Process

■■■ To establish a claim for violation of procedural due process, the plaintiff must prove that the defendants deprived her or her children of a liberty interest without following constitutionally adequate procedures. *See Board of Regents v.*

*Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrissey v. Brewer,* 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Parents, before being deprived of the custody of their children, are generally entitled to a predeprivation hearing. *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987). However, it is well established that in an "emergency," officials may deprive a parent of custody "without parental consent or a *prior* court order." *Id.* (quoting *Duchesne,* 566 F.2d at 826 (emphasis in original)); *see also Gottlieb,* 84 F.3d at 517; *Cecere v. City of New York,* 967 F.2d 826, 830 (2d Cir.1992) ("temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process"). An "emergency" is a situation where "the child is immediately threatened with harm, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence[.]" *Hurlman v. Rice,* 927 F.2d 74, 80 (2d Cir.1991), (internal citations omitted); *see also Robison,* 821 F.2d at 922. There must be an objectively reasonable basis for the belief that an emergency exists. *Gottlieb,* 84 F.3d at 520. "Where 'there [is] no room for any inference that there was not an emergency situation,' the court may direct summary judgment for the state actors." *Dietz v. Damas,* 932 F.Supp. 431, 444 (E.D.N.Y.1996) (internal citations omitted). Once there has been an emergency removal of a child without a hearing, due process requires that the parent be provided an opportunity to be heard at a reasonably prompt time after the removal. *Gottlieb,* 84 F.3d at 520, 522.

### a. Pre–Deprivation Process

Ms. Chi has a liberty interest in the custody of her children. In order to prevail on her procedural due process claim, she must demonstrate that a jury could find that the defendants lacked an objectively reasonable belief that an emergency existed in light of what they knew on July

5. From the facts presented, an inference can be drawn that no emergency existed that warranted depriving the plaintiff of custody.

■ First, there is no evidence that the defendants believed Ms. Chi abused Derick. On July 5, when the defendants made the decision to hold Derick in the hospital, they were familiar with the Initial Oral Report in which Dr. Danavis described Derick's injuries and concluded that they were suspicious. (Def. 56.1 Statement ¶¶ 2–3; Pl. 56.1 Statement ¶ 1). They also knew that Marc had been examined and was not injured, and they did not believe that he was in danger. (First Rivera Dep. at 16; Deposition of Rose Rivera dated July 21, 1997, attached as Exh. B to Kubitschek Decl. ("Second Rivera Dep.") at 11–13, 26–27). Further, Ms. Rivera knew that Ms. Chi was not at home when any of the injuries were believed to have occurred. (First Rivera Dep. at 14–17, 22). She later confirmed this fact with Ms. Chi's employer. (First Rivera Dep. at 36–37). In *Dietz*, the court found that a report, "filed by an identified, disinterested person with cause to know of abuse and a legal obligation to report it, confirmed by the treating resident physician, constitutes objectively reasonable evidence of an emergency to child protective personnel." *Dietz*, 932 F.Supp. at 445; *see also Tenenbaum v. Williams*, 862 F.Supp. 962, 970 (E.D.N.Y.1994) (emergency existed where child gave teacher specific information of sexual abuse by father but denied abuse to CWA worker). Likewise, in this case Dr. Danavis's report describing serious injuries characteristic of abuse constituted evidence that Derick had been abused. However, in *Dietz* the report identified both parents as being suspected of abuse. *Dietz*, 932 F.Supp. at 450. By contrast, it is undisputed here that by the time they decided to hold Derick, the defendants did not suspect Ms. Chi of abusing him. (Deposition of Barbara Ditman dated July 21, 1997, attached as Exh. Q to Kubitschek Decl. ("Ditman Dep.") at 35; First Rivera Dep. at 23; Second Rivera Dep. at 52). Nothing in Dr. Danavis's report linked Ms. Chi to the abuse, and the defendants had acquired substantial exculpatory information by July 5. Therefore, while the defendants had a reasonable belief that Mr. Lui abused Derick, they did not have such a belief about Ms. Chi.

Second, based on the current record, a finder of fact could infer that the defendants lacked a reasonable belief that Ms. Chi had neglected Derick. A caseworker had visited the children's home and had given it a positive evaluation. (Deposition of Carlyon Terrell dated February 6, 1998, attached as Exh. V to Kubitschek Decl.). There is conflicting testimony about whether Ms. Rivera told Ms. Chi that her husband was suspected of abusing Derick and no evidence that she had any other reason to suspect that to be the case.[2] (Chi Decl. at 2, 3). Ms. Chi informed Ms. Rivera in advance of her previously scheduled business trip to Washington and was not told to abort it. (First Rivera Dep. at 31; Second Rivera Dep. at 23, 31). She contends that she was prepared to return at any time and told Ms. Rivera that she would return when Derick was ready to be discharged. (Chi Decl. at 2–3). On July 5, Ms. Rivera called Ms. Chi's home in New York to let her know that Derick was ready to be discharged and to discuss the case with her. (First Rivera Dep. at 45; Second Rivera Dep. at 34–35, 40). According to Ms. Rivera, she was prepared to release Derick to Ms. Chi at that time if Ms. Chi would agree to participate in the Family Preservation Program, which provides intensive, short-term crisis interven-

**2.** Ms. Rivera has given conflicting testimony about what she told Ms. Chi. At the hearing on July 8, 1994, she testified that she informed Ms. Chi that her husband was suspected. (Kubitschek Decl., Exh. C at 10). On February 6, 1995, she testified that she did not (First Rivera Dep. at 22, 57–58), and on July 21, 1997, she testified that she did. (Second Rivera Dep. at 15, 67). Ms. Chi denies that Ms. Rivera had told her that Mr. Lui was under suspicion. (Chi Decl. at 2).

tion in order to keep families intact, and Ms. Chi had already expressed her willingness to do so. (First Rivera Dep. at 43, 45, 48; Second Rivera Dep. at 34–35, 40; Kubitschek Decl., Exh. S; Deposition of Chi Chao Yuan dated July 22, 1997, attached as Exh. L. to Kubitschek Decl. ("First Chi Dep.") at 71; Chi Decl. at 2). However, when Mr. Lui told Ms. Rivera that Ms. Chi was in Washington, Ms. Rivera did not ask for Ms. Chi's telephone number there or make any attempt to contact her. (First Rivera Dep. at 49; Second Rivera Dep. at 43).

■ In *Tenenbaum,* 862 F.Supp. 962, the court rejected the notion that CWA violated the rights of a mother who was not suspected of abuse when it removed and examined a child for abuse by her father:

> By plaintiffs' reasoning, ... a caseworker could remove a child only when all adults residing in the household participate in abuse. That is not the law. Sarah was temporarily removed from the home in which she and the suspected abuser resided. The fact that Mary Tenenbaum also was a member of that household and, therefore, incidentally impacted by the removal, is not violative of her constitutional rights.

*Id.* at 978–79. To the extent that this case implies that the non-abusing parent never has an interest distinct from that of the abusing parent, it is not persuasive. A non-abusing parent clearly retains some rights in her child's custody, although these may be contingent on separating the child from the abuser. Furthermore, the deprivation in *Tenenbaum* was far less significant than in this case, as the child there was removed only for an afternoon while in school and was returned at the end of the day. *Id.* at 967.

### b. *Post–Deprivation Process*

Following Derick's emergency detention on July 5, Ms. Rivera filed a child abuse and neglect petition on July 7. Derick and Marc were remanded that day and a hearing was held on July 8. (Kubitschek Decl., Exh. C). This hearing was reasonably prompt.

■ However, the plaintiff alleges that Ms. Rivera perjured herself at the hearing. The right to a fair tribunal includes the right to a proceeding free of perjury by state officials. "The introduction of false evidence in itself violates the due process clause." *Morrison v. Lefevre,* 592 F.Supp. 1052, 1073 (S.D.N.Y.1984); *see Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"); *ABF Freight System, Inc. v. N.L.R.B.,* 510 U.S. 317, 323, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) ("False testimony in a formal proceeding is intolerable.... In any proceeding, whether judicial or administrative, deliberate falsehoods 'well may affect the dearest concerns of the parties before a tribunal[.]' ") (citing *United States v. Norris,* 300 U.S. 564, 574, 57 S.Ct. 535, 81 L.Ed. 808 (1937)); *cf. van Emrik v. Chemung County Department of Social Services,* 911 F.2d 863, 866 (2d Cir.1990) (no constitutional violation where caseworker failed to state that reason parents claimed they could not explain child's injuries was because child was alone with babysitter).

■ According to the plaintiff, Ms. Rivera signed the petition alleging that Ms. Chi had abused Derick when she did not believe that Ms. Chi had done so, testified that Marc was abused when she knew that he was not, and falsely stated that before Ms. Chi went to Washington she had informed her that her husband had abused Derick. (Kubitschek Decl., Exh. C at 10, 14). Later, Ms. Rivera admitted that she never believed that Ms. Chi abused Derick (First Rivera Dep. at 23; Second Rivera Dep. at 52), knew all along that Marc was not abused (First Rivera Dep. at 16; Second Rivera Dep. at 11–12), and did not inform Ms. Chi that her husband was a

suspect prior to Ms. Chi's business trip to Washington (First Rivera Dep. at 23). The plaintiff has thus presented evidence which, if credited by the jury, would lead to a finding that Ms. Rivera committed perjury, thereby violating the plaintiff's constitutional rights. Therefore, this claim withstands summary judgment.

### 2. *Substantive Due Process*[3]

■ In evaluating a substantive due process claim in which the right of family integrity is at stake, the Second Circuit balances the liberty interests of the parent-child relationship against the state's interest in protecting the child's health and safety. *See Kia P.*, 2 F.Supp.2d at 289. This balance is a delicate one:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

*van Emrik*, 911 F.2d at 866. In *Joyner*, 712 F.2d 770, the court applied a three-step test to decide whether certain provisions of New York's Social Services Law infringed on the plaintiffs' custody rights. *Id.* at 777. First, the court identified the interest at stake to determine whether it was a fundamental right under the Fourteenth Amendment. *Id.* Second, it asked whether the state's action had significantly infringed upon that right. *Id.* Third, the court analyzed whether an important state interest justified the infringement. *Id.* Similarly, in *Gottlieb*, 84 F.3d 511, the court observed that government officials may remove a child from parental custody, at least pending investigation, where

"there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety." *Id.* at 518.

■ Here, the defendants separated Ms. Chi and her children for approximately three months, from July 7 to October 3, 1994. A separation this long constitutes significant infringement upon their right to live together. *See, e.g., Hirsch v. Otsego County Department of Social Services*, No. 89–CV–954, 1992 WL 59178, at *4–5 (N.D.N.Y. March 12, 1992) (denying motion for summary judgment where mother separated from child for over three months on grounds that caseworker's conduct "shocked the conscience"); *compare Joyner*, 712 F.2d at 778 (statute requiring parents seeking state-subsidized residential care for their children to temporarily transfer custody to state did not significantly interfere with parent's right to family integrity); *Fowler v. Robinson*, No. 94–CV–836, 1996 WL 67994, at *16 (N.D.N.Y. Feb. 15, 1996) (removal of children from classrooms to interview them during school not significant interference); *Tenenbaum*, 862 F.Supp. at 969 (parents' separation from of their child for single afternoon for medical examination did not significantly infringe fundamental right to live together). Thus, the plaintiff prevails as a matter of law on the first two prongs of the *Joyner* test.

■ As for the third prong of the test—whether an important state interest justified the defendants' infringement upon that right—hinges upon the same disputed issues of material fact raised by the procedural due process claim: whether there existed an objectively reasonable basis for the defendants' belief that placing the children in Ms. Chi's custody would threaten their health or safety. As discussed above, disputed issues of fact preclude summary judgment on that issue.

---

**3.** The plaintiff asserts in her seventh cause of action that the defendants breached their duty to act with reasonable care and grossly devi-

ated from accepted professional standards. These allegations relate to the plaintiffs' substantive due process claim.

### D. Fourth Amendment[4]

■■■■■ The plaintiff claims that the defendants violated her Fourth Amendment rights when they removed Marc and Derick without probable cause. It now appears that the Fourth Amendment applies in the context of child abuse proceedings and that children may not lawfully be removed from their parents' custody without probable cause. *Tenenbaum*, 862 F.Supp. at 976. Derick was seized when he was held in the hospital, *Kia P.*, 2 F.Supp.2d at 292 (child seized when held in hospital); *Gardiner v. Incorporated Village of Endicott*, 50 F.3d 151, 155 (2d Cir.1995) (person seized when "reasonable person would have believed that he was not free to leave") (citation omitted); Marc was seized when the state assumed custody of both boys. *Tenenbaum*, 862 F.Supp. at 973 (citing *van Emrik*, 911 F.2d at 867); *cf. Kia P.*, 2 F.Supp.2d at 292. While Ms. Chi does not have a Fourth Amendment claim herself because she was not the subject of a search or seizure, *see Tenenbaum*, 862 F.Supp. at 974, she does have standing to assert a Fourth Amendment claim on Marc and Derick's behalf. *See Kia P.*, 2 F.Supp.2d at 292.

### E. Malicious Prosecution

■■■■■ In the third cause of action, the plaintiff claims that the defendants maliciously prosecuted her when they initiated and continued abuse and neglect proceedings against her with malice and without probable cause. Malicious prosecution is a common law tort which states a claim under § 1983 only if it implicates a plaintiff's constitutional or federal statutory rights. *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir.1995); *see Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 n. 5 (2d Cir.1995) (where malicious prosecution claim arises from constitutional right other than Fourth Amendment, standard governing

that right determines whether constitutional violation occurred); *Easton v. Sundram*, 947 F.2d 1011, 1017 (2d Cir.1991) (cases typically involve rights secured by Fourteenth Amendment such as deprivation of a liberty interest). Here, the plaintiff alleges a liberty interest in family integrity which is clearly established under the Fourteenth Amendment. *See Gottlieb*, 84 F.3d at 518; *Joyner*, 712 F.2d at 777–78; *Duchesne*, 566 F.2d at 825.

■■■■■ Once the deprivation of a constitutional right is established, the elements of a § 1983 malicious prosecution claim are taken from the law of the forum state. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995). In New York, a cause of action for malicious prosecution has four elements: "(1) the initiation of an action by the defendant against the plaintiff, (2) begun with malice, (3) without probable cause to believe it can succeed, (4) that … terminates in the plaintiff's favor." *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir.1996) (citing *Broughton v. State*, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, 335 N.E.2d 310 (1975)).

■■■■■ As a preliminary question, however, the Court must determine whether a malicious prosecution claim is available for child abuse proceedings. According to the defendants, such claims may only be predicated on criminal proceedings, while a Family Court proceeding is civil in nature. *See People v. Roselle*, 84 N.Y.2d 350, 355, 618 N.Y.S.2d 753, 755, 643 N.E.2d 72 (1994); *People v. Smith*, 62 N.Y.2d 306, 309, 476 N.Y.S.2d 797, 798, 465 N.E.2d 336 (1984) ("child abuse or neglect proceeding under article 10 of the Family Court Act is a civil proceeding"). In *Easton*, the Second Circuit addressed the general issue as one of first impression and stated, "we do not hold that civil malicious prosecution

---

**4.** In her second cause of action, the plaintiff contends that the defendants violated her right to a constitutionally adequate investigation. The Constitution grants no such independent right; rather, the adequacy of the defendants' investigation is a component of the plaintiff's due process and Fourth Amendment rights. *See Kia P.*, 2 F.Supp.2d at 293; *Tenenbaum*, 862 F.Supp. at 978.

can never give rise to a cause of action under § 1983, although we suspect it normally will not." 947 F.2d at 1018. While under New York law malicious prosecution claims are usually limited to those based on criminal actions, New York does allow a claim based upon a civil action "provided there is a showing of some interference with plaintiff's person or property, by the use of such provisional remedies as arrest, attachment, replevin or injunction, or other burden imposed on plaintiff beyond the ordinary burden of defending a law suit." *O'Brien*, 101 F.3d at 1484 (citing *Williams v. Williams*, 23 N.Y.2d 592, 596 n. 2, 298 N.Y.S.2d 473, 477 n. 2, 246 N.E.2d 333 (1969), and *Belsky v. Lowenthal*, 62 A.D.2d 319, 321, 405 N.Y.S.2d 62, 64 (1st Dep't 1978), *aff'd*, 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979)) (holding that groundless civil claims of fraud and embezzlement supported by false affidavits did not rise to the required level); *Easton*, 947 F.2d at 1017 (civil suit for Medicaid fraud, endangering health and safety of mentally disabled clients, and siphoning public funds did not subject plaintiff to constitutional deprivation). Moreover, interference with person or property by means other than provisional remedies may satisfy the "special injury" requirement. *Engel v. C.B.S., Inc.*, 145 F.3d 499, 502–03 (2d Cir.1998). Here, depriving Ms. Chi of the custody of her children for several months reaches this threshold. *See Whelehan v. County of Monroe*, 558 F.Supp. 1093, 1098 (W.D.N.Y.1983) (holding that parents and children separated by Family Court order state cause of action for malicious prosecution under § 1983 because impact of pro-

tective orders on familial relationship satisfies constitutional injury requirement, but dismissing claim on ground that defendants were immune); *Watson v. City of New York*, 57 Misc.2d 542, 545–46, 293 N.Y.S.2d 348, 353–54 (N.Y.Civ.Ct.1968) (claim based on paternity proceeding in Family Court fulfills provisional remedy requirement). Therefore, the groundless initiation of a case in Family Court may give rise to a claim for malicious prosecution.

■■■ While "a finding of probable cause will defeat state tort claims for . . . malicious prosecution," *Zanghi v. Incorporated Village*, 752 F.2d 42, 45 (2d Cir. 1985), an inference can be drawn that the defendants did not have probable cause when they filed or pursued the charges against Ms. Chi.[5] With respect to the initial charge of abuse, it was not CWA's normal practice to file an abuse petition against both parents when one was determined to be the abuser. (Second Rivera Dep. at 54). Nevertheless, Ms. Rivera signed an abuse petition against the plaintiff when she did not believe that Ms. Chi had abused Derick. Ms. Rivera attempted to explain this anomaly by stating at various points that she did not understand the legal terminology, that her supervisors made the decision to file, that she believed that by signing she was affirming only the factual narrative, and that the attorney drafting the petition insisted that the charges be abuse. (Second Rivera Dep. at 54–64). However, for purposes of summary judgment, she can hardly disavow her signature on the petition. The defen-

---

**5.** Because the charges were both abuse and neglect, the defendants were required to have probable cause for each. Abuse and neglect are separate charges under the Family Court Act. Under section 1012, a child is abused if the caretaker non-accidentally inflicts or allows to be inflicted an injury that creates a substantial risk of death or serious injury, protracted disfigurement, protracted physical or emotional impairment, or the loss or impairment of a bodily organ's function. Family Court Act § 1012(e)(i), (ii). A child is neglected if the child's physical, mental, or

emotional condition is impaired or in imminent danger of impairment by a caretaker's failure to exercise minimum care in providing food, shelter, clothing, and education or in attending to the child's medical needs if financially able to do so. Family Court Act § 1012(f)(i)(A). A child is also neglected if the caretaker inadequately supervises, imposes excessive corporal punishment, or loses self-control through drugs or alcohol, Family Court Act § 1012(f)(i)(B), or abandons the child. Family Court Act § 1012(f)(ii).

dants' acknowledgment that they never believed that Ms. Chi abused Derick belies their claim that they had probable cause to charge Ms. Chi with abuse.

The neglect charge is based on Ms. Chi's business trip while Derick was in the hospital. As explained above, a jury could find that the defendants lacked a reasonable belief that this behavior constituted neglect. Therefore, an inference can be drawn that they lacked probable cause to file neglect charges.

On September 9 the defendants filed an amended petition reducing the charges against Ms. Chi to neglect only, and adding specific allegations that she had gone to Washington while her baby was in the hospital and left her husband to care for Derick when he was released. (Chi Decl., Exh. C). Between the filing of the first petition and the amended petition, the defendants apparently learned no additional information other than that contained in Dr. Watkins' letter. While this letter established that some of Derick's bruises were older than his fractures, it cast doubt on whether any bleeding had occurred in his brain. (Lerner Decl., Exh. A). Substantively, the defendants knew no more after they received the letter than they did before: that Derick was injured, that some of his injuries were days older than others, and that the injuries were characteristic of abuse. Thus, nothing the defendants learned during the course of the proceedings would have justified after the fact their initiation of the prosecution.

In addition to the absence of probable cause generally, the plaintiff points to specific acts and omissions of Ms. Rivera as indicia of malice. Ms. Rivera allegedly failed to advise Ms. Chi that in order to regain custody of Derick upon his discharge from the hospital she would have to stay in New York; she failed to tell Ms. Chi that Derick's injuries indicated abuse or that her husband was suspected; she made no attempt to contact Ms. Chi in Washington; she failed to inform Ms. Chi that her children could be returned if Mr.

Lui left the apartment; and she reported Ms. Chi to the State Central Registry as an abusive parent. Furthermore, Ms. Rivera signed an abuse complaint against Ms. Chi on July 7, although she knew by this time that Ms. Chi was not the abuser, and she testified falsely on July 8, 1994 that Marc was abused. (Kubitschek Decl., Exh. C; Second Rivera Dep. at 74). These allegations raise issues of fact regarding malice. See Fowler, 1996 WL 67994, at *8 ("Confronted with evidence that a malicious prosecution defendant failed to investigate inconsistent evidence, withheld material facts or information, or misrepresented or falsified information to effect the arrest and prosecution of plaintiff, the Court cannot find as a matter of law that probable cause existed for the plaintiff's prosecution.").

█ Of course, evidence of Ms. Rivera's individual acts does not automatically demonstrate malice by Ms. Concepcion and Ms. Ditman. However, Ms. Concepcion participated in four conferences about the case, including the one in which the decision was made to file the abuse and neglect petition, and Ms. Ditman made the decision to file the petition against Ms. Chi. (First Rivera Dep. at 10, 35–36; Second Rivera Dep. at 9–10, 22–26, 28). Neither believed that Ms. Chi abused Derick. (Ditman Dep. at 35). Under New York law, a plaintiff need not prove actual spite or hatred to prove malice but only "that the defendant ... commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Lowth v. The Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir.1996) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978)). The Second Circuit has interpreted this to mean that the "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 131 (2d Cir.1997). Ms. Ditman and Ms. Concepcion's direct participation

in the decision to file an abuse petition without probable cause thus raises issues of fact regarding malice.

### F. Retaliation

In the third cause of action, the plaintiff charges that the defendants retaliated against her for exercising her First Amendment right to complain to government officials about the conduct of municipal employees. This retaliation, Ms. Chi alleges, consisted of instituting and continuing child abuse proceedings against her and detaining her children without a valid reason. Although the plaintiff also initially asserted that the defendants reported to the State Central Registry that she was an abusive or neglectful parent after the Family Court had dismissed all charges against her, she presented no evidence to support this claim.

■ To establish a retaliation claim under § 1983, the plaintiff must prove (1) that her conduct was protected by the First Amendment and (2) that the defendant's actions were motivated by or substantially caused by her exercise of free speech. *Hankard v. Town of Avon,* 126 F.3d 418, 421–22 (1997); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Wells v. Wade,* 36 F.Supp.2d 154, 158 (S.D.N.Y.1999).[6] Ms. Chi's conduct is clearly protected by the First Amendment. She and her husband retained counsel who represented them in Family Court. She spoke with Ms. Croft about her case sometime between July 7, 1994 and August 29, 1994. (Deposition of Chi Chao Yuan dated August 26, 1997, attached as Exh. M to Kubitschek Decl. ("Second Chi Dep.") at 124–26). She was interviewed for Chinese-language newspapers, although she does not remember what she told them, (Second Chi Dep. at 117–18), and she wrote a letter to then-Governor Cuomo at some point before September 12, 1994. (Kubitschek Decl., Exhs. I, P). "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi,* 18 F.3d at 194; *see United Mine Workers v. Illinois Bar Association,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("the right [ ] . . . to petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press.").

■ However, the plaintiff has not introduced evidence which, if taken as true, would allow the Court to infer that the defendants were substantially motivated by her exercise of her free speech rights when they initiated and filed the petition and had the children removed. *See Gagliardi,* 18 F.3d at 195 ("While a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred"); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998) (where no allegation that defendant was aware of protected conduct, claim dismissed as "wholly conclusory"); *Yearwood v. LoPiccolo,* No. 95 Civ. 2544, 1998 WL 474073, at *5 (S.D.N.Y. Aug. 10, 1998) (plaintiff cannot defeat summary judgment motion on mere assertion that defendants' affidavits

---

**6.** The defendants argue that to state a First Amendment claim, the plaintiff must plead and prove that the defendants actually chilled the exercise of First Amendment rights. Such a showing is indeed required where a plaintiff alleges an attempt to restrain future speech. *See, e.g., Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998). An allegation of actual chilling is also required where a plaintiff alleges that the prosecution was in retaliation for her exercise of First Amendment rights, notwithstanding the fact that probable cause for the prosecution is established. *Dietz,* 932 F.Supp. at 457 (citing *Singer,* 63 F.3d at 120). In this case, the plaintiff alleges no attempt to restrain future speech, and the existence of probable cause to initiate child abuse proceedings is in dispute. Therefore, no allegation of effective chilling is required for the claim to survive summary judgment.

that they did not retaliate are not credible). CWA's investigation was instigated by a hospital employee's report to the State Central Registry. The only evidence of some sort of protected action from this point until the petition was filed are Ms. Rivera's statements that: "everybody was calling on this case. It was a big commotion about this case. All kinds of people were calling.... There was a lot of people involved." (Second Rivera Dep. at 60–61). In fact, Ms. Rivera claimed that an attorney for Derick's parents called her before she was even assigned the case. (Second Rivera Dep. at 61). The plaintiff also claims that after she complained, Ms. Rivera withdrew her initial offer of preventive services and support. However, the evidence indicates that the Family Preservation Program was an option only if CWA decided not to file the petition; thus, once Ms. Rivera filed the petition she no longer offered such services. (Second Rivera Dep. at 15–16, 31; First Chi Dep. at 68, 70–71; Kubitschek Decl., Exh. S at 1 ("Family Preservation ... is targeted to families at imminent risk of having at least one child placed outside the home.")). That Ms. Chi was represented by counsel, that the case attracted publicity from its inception, and that Ms. Rivera did not continue to offer preventive services after the case was filed do not lead to an inference of improper motive. *See Amato v. City of Saratoga Springs*, No. 77–CV–1443, 1998 WL 903625, at *3 (N.D.N.Y. December 23, 1998) (temporal relationship between protected activity and adverse action is circumstantial evidence of retaliation but not sufficient by itself to establish prima facie case of retaliation); *compare Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir.1995) (prima facie case of retaliation against prisoner established where temporal relationship between protected acts and punishment, evidence of prior good behavior submitted, and defendant admitted retaliatory scheme); *Wells*, 36 F.Supp.2d at 158 (reasonable inference of retaliation where defendant saw plaintiff file grievance, filed false disciplinary re-

port with forged signatures soon after, and disciplinary hearing proved report false).

Ms. Chi's meeting with Ms. Croft, her communication with the Chinese-language media, and her letter to then-Governor Cuomo all happened after the petition was filed and the children were removed. While it is questionable whether there was probable cause to file the petition, after doing so the defendants acquired no additional exonerating information about Ms. Chi that might have caused them to stop prosecuting the case. In addition, there is no evidence that the defendants were ever aware of Ms. Chi's interviews with the Chinese-language media, and they learned of the letter to Governor Cuomo only after the amended petition was filed. (Kubitschek Decl., Exhs. I, P). Therefore, no inference, much less a substantial one, can be drawn that the defendants' continued prosecution was in retaliation for Ms. Chi's protected conduct.

### G. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment directs that similarly situated persons should be treated alike. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish an equal protection violation, plaintiffs must prove purposeful discrimination, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); *see also Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). Where a distinction is drawn on the basis of gender, differential treatment is unlawful "unless is it substantially related to a sufficiently important government interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249 (citing *Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), and *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)).

The plaintiff claims that the defendants interpreted as neglect the fact that she traveled for business while her husband cared for the children, and that had their roles been reversed, the defendants would not have considered a man's business travel neglectful. As evidence of unequal treatment, Ms. Chi first points to Ms. Rivera's statement that she believed it was negligent for her to go to Washington "[b]ecause her child was in the hospital." (First Rivera Dep. at 51; see Second Rivera Dep. at 58–59). Second, Ms. Rivera characterized the couple's arrangement for Mr. Lui to care for the children as "a problem in the home" because "he was unemployed. He had been unemployed for quite a while. He had a problem holding a job." (First Rivera Dep. at 54). Third, Ms. Rivera stated that she believed that Ms. Chi was neglectful because "[s]he was away for quite a while when the child was hurt. And she didn't even come home on the weekends to give her husband a break when she could have." (Second Rivera Dep. at 46–47).

█ Fundamental to the plaintiff's claim is the contention that Ms. Chi was treated differently than similarly situated men. However, the plaintiff has failed to produce any evidence to this effect. While both the plaintiff and the defendants agree that Ms. Rivera criticized Ms. Chi's behavior and acted on that basis, no evidence indicates that she would not have treated a man similarly. Conclusory allegations of discrimination do not satisfy Rule 56(e)'s requirements. *Meiri v. Dacon*, 759 F.2d 989, 998 (1985) (upholding grant of summary judgment against Title VII claim). Therefore, the plaintiff's equal protection claim must be dismissed.

### H. *Supervisor Liability*

█ Ms. Rivera is directly responsible for many of the actions about which the plaintiff complains: she performed the investigations, she signed the petitions, and she testified at the hearing and at trial. However, the plaintiff also brings claims against other CWA officials: Ms. Rivera's supervisor, Maria Concepcion; her manager, Barbara Ditman; the Commissioner of DSS, Marva Hammons; and the Deputy Commissioner of DSS and Director of CWA, Kathryn Croft. (Ditman Decl. ¶ 1). A supervisory official cannot be held liable under § 1983 simply on the basis of the acts of a subordinate. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir.1993). To establish a supervisor's § 1983 liability, a plaintiff must show personal involvement by the supervisor through: (1) direct participation in a violation, (2) failure to remedy a wrong after learning of a violation, (3) creation or perpetuation of a policy or custom under which violations occur; or (4) gross negligence in managing subordinates who caused a violation. *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986); see *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1066 (2d Cir.1989); *Robbins v. Doe*, 994 F.Supp. 214, 218–19 (S.D.N.Y.1998). "Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent." *Cecere*, 967 F.2d at 829.

█ Ms. Concepcion, in addition to supervising Ms. Rivera, was directly involved in the contested events. She participated in conferences and decisions about the case on June 29 when the case was assigned to Ms. Rivera, on July 1 after Ms. Rivera had completed initial investigation, and on July 6 when the decision was made to file a petition against the plaintiff. (First Rivera Dep. at 10, 36; Second Rivera Dep. at 9–10, 24–26, 28). She completed extensive paperwork about the case as it progressed (Kubistchek Decl., Exhs. I, P), and signed the report to the court along with Ms. Rivera. (Lerner Decl., Exh. I). On September 12, 1994, she spoke with an official at the State Central Registry who added Ms. Chi and Marc to the case after that

conversation. (Kubistchek Decl., Exhs. I, P). Given this evidence, a jury could find substantial personal involvement by Ms. Concepcion.

Ms. Ditman participated in both the July 1 and the July 6 conferences with Ms. Rivera and Ms. Concepcion about the case. (First Rivera Dep. at 35–36; Second Rivera Dep. at 22–26). On July 6, Ms. Ditman made the decision to file the petition. (Second Rivera Dep. at 25–26; Deposition of Maria Concepcion dated July 23, 1997, attached as Exh. W to Kubistchek Decl. at 13). Also, Dr. Watkins' July 26 letter was addressed to Ms. Ditman. (Lerner Decl., Exh. A). A jury could find from this evidence that Ms. Ditman was personally involved in the case.

In contrast, the plaintiff has presented no evidence that Ms. Hammons had any personal involvement despite her official title. She was the Commissioner of DSS, and as such was authorized by New York state law to investigate complaints of child abuse and neglect and to offer rehabilitative and preventive services to children and parents. CWA is part of DSS. However, there is no evidence that she knew of the contested conduct, that she participated in the creation of any unlawful policy, or that she negligently managed her subordinates. Therefore, the claims against Ms. Hammons are dismissed.

Kathryn Croft began working as Deputy Commissioner of DSS and Director of CWA on August 29, 1994, almost two months after the children were removed. Ms. Chi approached Ms. Croft sometime after July 7 and after Ms. Croft had been appointed but before she assumed her responsibilities. The plaintiff claims that at this meeting she notified Ms. Croft of the alleged violations, which subsequently went uncorrected. "Where conduct of the supervisory authority is directly related to the denial of a constitutional right it is not to be distinguished, as a matter of causation, upon whether it was action or inaction." *Duchesne*, 566 F.2d at 832. However, the only evidence about the meeting consists of Ms. Chi's testimony that she did not remember with any specificity what she and Ms. Croft discussed: "I don't remember exactly what we talked about, but I talked with her about this case and then she—I think she also said something, but I really don't remember the record exactly .... She suggested to get, like, expert on children's injuries. Something like that." (Second Chi Dep. at 126). The plaintiff has not demonstrated that she raised any issues that would have created constitutional obligations on Ms. Croft's part. Thus, the charges against Ms. Croft are likewise dismissed.

## I. *Qualified Immunity*

■■■ Government employees sued in their individual capacities enjoy qualified immunity when they perform discretionary functions if either (1) their conduct "did not violate clearly established rights of which a reasonable person would have known," or (2) it was objectively reasonable to believe that their acts did not violate these rights. *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998) (quoting *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir.1993)); *see Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Robison*, 821 F.2d at 919–20 (officials responsible for removing children from parents' custody not entitled to absolute immunity but may be entitled to qualified immunity). Qualified immunity is an affirmative defense that the defendant must plead and prove. *Shechter v. Comptroller of the City of New York*, 79 F.3d 265, 270 (2d Cir.1996). On a motion for summary judgment, a qualified immunity defense must be upheld as a matter of law when

the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant

to believe that she was acting in a fashion that did not violate [a clearly established] right.

*Gottlieb,* 84 F.3d at 518.

To decide whether a right was clearly established at the time the conduct occurred, a court must ask: "(1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" *Young,* 160 F.3d at 903. Furthermore:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (citation omitted).

### 1. *Due Process Rights*

 The defendants state that the plaintiff's due process rights were not clearly established at the time of the challenged conduct, but they give no explanation for this assertion. Indeed, they cite to *Robison,* 821 F.2d 913, which held in 1987 that the right of the family to remain together was then clearly established. *Id.* at 921 (finding defendants immune on ground that was objectively reasonable to believe were violating no federal rights under circumstances). The defendants' bare assertion that the plaintiff's due process rights were not clearly established is not persuasive. "Affirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." *Shechter,* 79 F.3d at 270 (citation and internal quotation omitted). In fact, in June 1994 both the substantive constitutional right of parents to the care and custody of their children and the law that the state cannot remove children without a prior hearing except in emergency situations were clearly established. *See Cecere,* 967 F.2d at 829 (stating that in 1986, "it was clearly established that a parent's interest in the custody of a child was a constitutionally protected liberty interest subject to due process protection," but holding that qualified immunity shields from liability child agency supervisor who held objectively reasonable belief that emergency situation justified continued deprivation of custody); *Sundbye v. Ogunleye,* 3 F.Supp.2d 254, 265 (E.D.N.Y.1998) (parents' interest in custody of child clearly established).

Therefore, whether the individual defendants are entitled to qualified immunity on the due process claims depends on whether it was objectively reasonable for each to believe that her actions did not violate the plaintiff's rights. The reasonableness of their beliefs is not judged subjectively but by what reasonable people in their positions should have known about the constitutionality of their conduct. *Young,* 160 F.3d at 903; *Anderson,* 483 U.S. at 638–41, 107 S.Ct. 3034. On this issue, the parties direct the Court to their constitutional arguments on whether the defendants 'had an objectively reasonable belief that an emergency existed and whether they had probable cause to file and continue the proceedings against Ms. Chi. As is clear from the discussion of these claims above, there are disputed issues of material fact as to the objective reasonableness of the defendants' actions.

### 2. *Fourth Amendment Rights*

 The Supreme Court has not addressed whether the Fourth Amendment's probable cause requirement must be met prior to the removal of children from their parents. The Second Circuit has discussed the Fourth Amendment in this context, but only to hold that without parental consent, state officials cannot order purely investigatory x-rays of a child without prior court approval. *van Emrik,* 911 F.2d at

867. van *Emrik* thus does not clearly establish that the Fourth Amendment applies in child abuse proceedings. In *Tenenbaum*, the court explicitly held that "the probable cause and warrant requirements apply to child abuse searches and seizures under the Fourth Amendment," 862 F.Supp. at 976 (finding that child's Fourth Amendment rights not violated because probable cause existed for emergency removal), but as a district court case, *Tenenbaum* does not constitute clearly established law for immunity purposes. *See id.,* at 976–77 (application was unsettled in 1990 and still unclear in 1994). Therefore, the individual defendants are entitled to qualified immunity on the Fourth Amendment claim.

### J. *Claims Against the City of New York*

■ The City of New York may not be sued on a *respondeat superior* theory for the torts of its employees. *Villante v. Department of Corrections*, 786 F.2d 516, 519 (2d Cir.1986) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Rather, to establish a municipality's liability under § 1983, a plaintiff must demonstrate that an officially sanctioned policy or practice caused the deprivation of her rights: "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *see Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir.1992). A plaintiff need not demonstrate that the municipality had a formal rule or regulation that caused the constitutional deprivation. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995); *Villante*, 786 F.2d at 519. Instead, the plaintiff may establish a policy or custom by demonstrating that the municipality was alerted to the possibility that its employees were engaged in constitutional violations but responded with deliberate indifference. *Vann*, 72 F.3d at 1049; *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986).

■ Likewise, a municipality can be found liable under § 1983 for a failure to train its employees. *City of Canton v. Harris*, 489 U.S. 378, 390–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). However, such a claim triggers municipal liability only where "the failure to train amounts to deliberate indifference to the rights of those with whom the state officials will come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Young*, 160 F.3d at 903. In order to support a claim that a failure to train amounts to "deliberate indifference," a plaintiff must demonstrate: (1) that "a policymaker [of the municipality] knows 'to a moral certainty' that [its] employees will confront a given situation"; (2) that "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker*, 974 F.2d at 297–98.

■ A suit against municipal employees in their official capacity is deemed to be a suit against their employer, in this case the City of New York. *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("the real party in interest in an official-capacity suit is the governmental entity and not the named official"); *Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993). The plaintiff brings two claims against the City. First, she challenges CWA's policy of removing all children in the household if one child is being removed and allege that this policy violated Marc and Ms. Chi's constitutional right to family integrity. As evidence that such a policy exists, the plaintiff offers Ms. Rivera's statements that "it is their policy, when one child is at risk, it is deemed that

the other children might be at risk also. And it is usually the policy to remove all of the children." (Second Rivera Dep. at 75–76). The defendants point to Ms. Croft's declaration that CWA has no improper policies that resulted in a violation of the plaintiff's constitutional rights. (Declaration of Kathryn Croft dated August 28, 1998, attached to Lerner Decl.). However, this bare assertion does not describe any specific CWA policy and does not refute the plaintiff's claim that the defendants' policy is to remove all children in the household. As the defendants have not come forward with any additional evidence about the policy, Ms. Rivera's statements constitute evidence of a policy sufficient to survive summary judgment.

■ Second, the plaintiff claims that the City failed to train CWA employees on changes in New York law. Under recently enacted New York law, a Family Court judge has the discretion to issue orders of protection excluding the abuser in lieu of removing the child.[7] Even assuming that this provision creates a right under state law, a *Monell* claim cannot be predicated on a failure to train with respect to state law alone. *Robison*, 821 F.2d at 922 ("a violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Young*, 160 F.3d at 902 ("The procedure mandated by state family law is not the benchmark for evaluating whether or not there has been a federal constitutional violation."). Rather, employees must have violated a clearly established constitutional right. *Id.*, at 904. Therefore, the plaintiff's failure to train claims against Ms. Hammons, Ms.

Croft, and the City of New York are dismissed.

### K. *State Law Claims*

■ The plaintiff brings tort claims under New York state law for interference with custody, unlawful imprisonment, and malicious prosecution. The defendants argue that the Court lacks subject matter jurisdiction over these claims because the plaintiff failed to properly file a notice of claim as required by General Municipal Law §§ 50–e, 50–i and County Law § 52(1). These laws require that a written notice of claim be made and served upon the defendant city or county within ninety days after the claim arises. A notice of claim need not be filed by a child injured while in CWA's custody. New York General Municipal Law § 50–e(8); *Umlauf v. County of Chautauqua*, 132 A.D.2d 958, 518 N.Y.S.2d 491 (4th Dep't 1987), *appeal dismissed*, 70 N.Y.2d 1002, 526 N.Y.S.2d 438, 521 N.E.2d 445 (1988). However, this exception does not apply when, as in this case, the cause of action arises out of the removal itself, because in these circumstances the parent has notice of a cause of action from the outset. *See Maurice W. v. Onondaga County Department of Social Services*, 186 A.D.2d 986, 588 N.Y.S.2d 448 (4th Dep't 1992). Therefore, the notice of claim requirement applies in this case.

■ Derick and Marc were removed on July 5 and July 7, 1994. The plaintiff's causes of action for interference with custody and unlawful imprisonment therefore accrued no later than October 3, 1994, when the boys were returned to Ms. Chi's custody. However, she did not file her

---

**7.** Family Court Act § 1022 provides that where a Family Court may order a child temporarily removed from his or her home before a petition is filed, it "shall also consider and determine whether imminent risk to the child would be eliminated by the issuance of a temporary order of protection, pursuant to section ten hundred twenty-nine of this act, directing the removal of a person or persons from the child's residence." Family Court Act § 1022(a)(iii). Sections 1027 and 1028,

respectively, provide that the Family Court shall make the same consideration in hearings following the temporary removal of a child without a court order and when parents apply to have returned a child temporarily removed. Family Court Act §§ 1027(b)(iv), 1028(f). Under § 1023, anyone who has the power to initiate a proceeding may seek an order of protection and the court may issue an order on its own motion. Family Court Act § 1023.

notice of claim with the New York City Law Department until November 29, 1995, more than a year later. (Lerner Decl., Exh. N). Therefore, the notice of claim was untimely as to these causes of action, and they are dismissed.

■ By contrast, "[a] cause of action for malicious prosecution arises on the date that the criminal charges against the defendant are dismissed on the merits or a verdict is entered in defendant's favor[.]" *Vitale v. Hagan*, 132 A.D.2d 468, 469, 517 N.Y.S.2d 725, 726 (1st Dep't 1987), *modified*, 71 N.Y.2d 955, 528 N.Y.S.2d 823, 524 N.E.2d 144 (1988). The Family Court petition was dismissed on August 31, 1995. Therefore service of the notice of claim was made within ninety days and was timely.

■ Under New York Law, the defendants are entitled to immunity when they are "acting in good faith in the removal or keeping of a child" pursuant to the emergency removal provision of the Family Court Act. Family Court Act § 1024(c); *see* New York Social Services Law § 419 (presumption of good faith). While under New York Social Services Law § 419 defendants are generally presumed to have acted in good faith, this presumption does not apply to liabilities resulting from "willful misconduct or gross negligence." New York Social Services Law § 419; *see Mosher–Simons v. County of Allegany*, 94–CV–374S, 1997 WL 662512, at *6 (W.D.N.Y. Sept. 30, 1997) ("Gross negligence undermines the presumption of good faith performance, and prevents the invocation of immunity."); *Defore v. Premore*, No. 88–CV–241, 1992 WL 88043, at *8 (N.D.N.Y. April 27, 1992) (summary judgment denied where jury could find willful conduct or gross negligence from allegations that defendants obtained custody by misrepresenting voluntary custody forms to plaintiff); *but see Tenenbaum*, 862 F.Supp. at 981 (defendants entitled to absolute immunity on state law claims). Gross negligence is defined as "an aggravated disregard for the rights and safety and others." *Mosher–Simons*, 1997 WL 662512, at *6 (quoting *Ricciardi v. Con Edison*, 161 Misc.2d 917, 918, 615 N.Y.S.2d 854, 855 (City Ct.1994)). Here, the plaintiff has presented facts from which a reasonable jury could find willful misconduct or gross negligence in securing Derick and Marc's removal on the basis of the defendants' filing of a petition without reasonable cause and on the basis of Ms. Rivera's alleged perjury at the hearing. *See Van Emrik v. Chemung County Department of Social Services*, 191 A.D.2d 143, 147, 600 N.Y.S.2d 157, 159 (3d Dep't 1993) ("in certain situations, such as the temporary removal of a child from parental custody, the good-faith inquiry may well include investigation into whether defendants had reasonable cause to believe that the parents posed a danger to the child").

The defendants also assert that they are entitled to immunity under New York common law. In New York, government officials are liable for exclusively ministerial acts but not for acts involving the exercise of discretion. *Tango v. Tulevech*, 61 N.Y.2d 34, 40, 471 N.Y.S.2d 73, 76, 459 N.E.2d 182 (1983); *see Haddock v. City of New York*, 75 N.Y.2d 478, 484, 554 N.Y.S.2d 439, 443, 553 N.E.2d 987 (1990). Discretionary acts "involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Tango*, 61 N.Y.2d at 41, 471 N.Y.S.2d at 77, 459 N.E.2d 182. While the decision to remove a child is generally protected by the privilege, *see Mosher–Simons*, 1997 WL 662512, at *7–8 (removal discretionary and generally covered by common-law immunity), a caseworker who acts in bad faith or without a reasonable basis, or who testifies falsely at a Family Court hearing is not shielded. *Pietra v. State*, 71 N.Y.2d 792, 798, 530 N.Y.S.2d 510, 513, 526 N.E.2d 1 (1988) (no immunity for state where officials act in bad faith or without reasonable basis); *Cromwell v. New York City De-*

*partment of Social Services,* 239 A.D.2d 299, 658 N.Y.S.2d 24 (1st Dep't 1997) (claim of qualified immunity rejected where defendant lied at hearing and to plaintiff). Because a jury could find that the defendants committed these acts, the plaintiff's state law malicious prosecution claim is not dismissed.

*Conclusion*

For the reasons set forth above, the defendants' motion for summary judgment is granted insofar as it seeks dismissal of the Fourth Amendment, equal protection, and retaliation claims, the claims against Ms. Hammons and Ms. Croft in their individual capacity, the failure to train claim against Ms. Hammons, Ms. Croft, and the City of New York, and the state law claims of interference with custody and unlawful imprisonment. The motion is denied with respect to the remaining claims.

SO ORDERED.